**GILA RIVER INDIAN COMMUNITY, Plaintiff–Appellant,**

v.

**Paul WADDELL, as Director of the Department of Revenue of the State of Arizona, Defendant–Appellee.**

No. 90–16838.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1992.

Decided June 26, 1992.

---

Rodney Lewis, Gila River Indian Community, Sacaton, Ariz., W. Scott Bales and G. Murray Snow, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., for plaintiff-appellant.

Patrick Irvine, Asst. Atty. Gen., Phoenix, Ariz., for defendant-appellee.

Before: FLETCHER, NELSON and FERNANDEZ, Circuit Judges.

FLETCHER, Circuit Judge:

The Gila River Indian Community (the Tribe) appeals the district court's dismissal of its action for declaratory and injunctive relief. The Tribe sought to enjoin Paul Waddell, in his capacity as Director of the Arizona Department of Revenue (the State), from imposing a tax on the sale of tickets and concessionary items in connection with the sporting and cultural activities that take place on the Gila Reservation. The Tribe claimed that the doctrines of federal preemption and tribal sovereignty preclude the State from levying taxes on entertainment events occurring wholly on reservation property. The district court dismissed the Tribe's suit for failure to state a claim. We reverse.

## I.

We accept the allegations of fact found in the Tribe's complaint as true for purposes of reviewing the dismissal of its action for failure to state a claim. *Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir.1990). The Tribe consists of the confederated Pima and Maricopa Tribes of Indians and enjoys official status under the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.* (1988). Pursuant to that Act, the Secretary of the Interior has approved the Tribe's constitution and by-laws. The United States holds fee title to most of the Tribe's reservation in trust for the Tribe. The reservation borders the Phoenix Metropolitan Area in Arizona.

In the early 1970s, the Tribe constructed a lake and marina on its reservation wholly from federal funds. With the assistance and supervision of the Bureau of Indian Affairs, the Tribe sought to develop these facilities, known as Firebird Lake and the Sun Valley Marina, in a manner that would foster its economic growth. It chartered the Sun Valley Marina Corporation (Sun Valley), a tribal entity, and leased to it the Firebird Lake property. This lease was authorized by the Secretary of the Interior pursuant to 25 U.S.C. § 415 (1988), which provides that the Secretary must review and approve the lease of all lands held in trust for a tribe by the United States.

In April of 1983, Sun Valley subleased four separate parcels of the Firebird Lake property, including the lake, to a non-Indian partnership known as Firebird International Raceway Park (Firebird). The lease, which again was approved by the Secretary of the Interior, provided that Firebird would construct substantial improvements on the property in order to conduct motor and aquatic racing events. Pursuant to the lease, Firebird built improvements around the lake to facilitate boat racing, constructed a drag strip and other racing tracks for automobiles, erected bleachers to seat more than fifteen thousand people, and built picnic facilities, restrooms and concession stands. Under the terms of the lease, these improvements belong in their entirety to the Tribe. Firebird further pays the Tribe a sizeable base rent annually, as well as a graduated percentage of its gross receipts in excess of four million dollars. In addition, the Tribe taxes the sale of

tickets and concessions by Firebird. Firebird, which employs a significant number of Tribal members in connection with its operations, began holding racing events at the Tribe's facilities in the summer of 1983.

Firebird subleased, with the approval of the Secretary and the Tribe, a portion of the Gila property to another non-Indian entity, the JBD Corporation (known as Compton Terrace), for the construction and operation of an amphitheater for the performing arts. In accordance with the terms of the sublease, Compton Terrace built a theater, restrooms and dressing facilities, and Firebird constructed additional concession buildings and a road leading to various parking areas. These improvements also belong to the Tribe. The Tribe further receives a percentage of Compton Terrace's gross receipts for each performance, and places a sales tax on theater tickets, concessions and souvenirs. As in the case with Firebird, Compton Terrace employs a significant number of Tribal members in connection with its operations. Compton Terrace began putting on shows at the Tribe's facilities in late 1984.

The State assessed its transaction privilege tax of five percent on Compton Terrace's ticket revenues during the 1987 and 1988 seasons. It has also advised Firebird that it must commence paying the same tax in connection with the sporting events which it conducts on the Tribe's property. On May 31, 1990, the Tribe filed the instant suit seeking declaratory and injunctive relief from the imposition of the State's taxes on events occurring on its reservation.

## II.

■ The district court has jurisdiction under 28 U.S.C. §§ 1331 and 1362. The barrier posed by 28 U.S.C. § 1341 to suits in federal court challenging the assessment, levy or collection of State taxes does not apply to actions commenced by an Indian tribe. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 470–475, 96 S.Ct. 1634, 1639–1642, 48 L.Ed.2d 96 (1976);

*Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 659 (9th Cir.1989), *cert. denied*, 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990). We have jurisdiction under 28 U.S.C. § 1291.

We review de novo a district court's dismissal of an action for failure to state a claim. *Abramson*, 897 F.2d at 391 (9th Cir.1990). "Dismissal is improper unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1990) (quoting *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), in turn quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). Because the district court erred in determining that the Tribe can establish no circumstances under which relief would be warranted from Arizona's taxation of non-Indian enterprises doing business on reservation property, we reverse.

## III.

■ The Supreme Court has addressed on a number of occasions the efforts of states to impose taxes on non-Indians conducting business on Indian reservations, and has repeatedly declared that there exists "no rigid rule" governing such exercises of State authority. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). Instead, the Court has emphasized the need to assess on a case-by-case basis the applicability of "two independent but related barriers to the assertion of state regulatory authority over tribal reservations...." *Id.* These barriers are the doctrines of federal preemption and tribal self-government. "[They] are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." *Id.* at 143, 100 S.Ct. at 2583.

### A.

■ The Court has stressed that the standards generally used to determine

whether a state law is preempted by federal enactments do not apply in cases where a state seeks to extend its authority onto Indian reservations. The Court has thus rejected the notion that an explicit statement of Congressional purpose is required to preempt the application of state taxes to activities occurring on-reservation. "[The state's] argument is reduced to a claim that [it] may assess taxes on non-Indians engaged in commerce on the reservation whenever there is no express congressional statement to the contrary. That is simply not the law. In a number of cases we have held that state authority over non-Indians acting on tribal reservations is preempted even though Congress has offered no explicit statement on the subject." *White Mountain Apache Tribe v. Bracker*, 448 U.S. at 150–51, 100 S.Ct. at 2587–88 (citations omitted).

Rather than relying on the normal principles of preemption, the Court has declared that a determination as to whether a state's efforts to regulate non-Indians engaging in on-reservation activity are preempted "call[s] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145, 100 S.Ct. at 2584. Thus, "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983). *See also Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176–77, 109 S.Ct. 1698, 1707–08, 104 L.Ed.2d 209 (1989); *Ramah Navajo School Bd. v. New Mexico*, 458 U.S. 832, 837–38, 102 S.Ct. 3394, 3398–99, 73 L.Ed.2d 1174 (1982); *Hoopa Valley*, 881 F.2d at 659. In conducting this balancing of federal, tribal and state interests, the Court has added that "[t]he traditional notions of Indian sovereignty provide a crucial 'back-

drop' against which any assertion of state authority must be assessed," as does the fact that "both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes." *Mescalero*, 462 U.S. at 334–35, 103 S.Ct. at 2386–87 (citations omitted).

On a number of occasions, the Court has found state efforts to tax the activities of non-Indians on tribal reservations preempted by federal law. In *Bracker*, the Court invalidated the State of Arizona's attempts to collect motor vehicle taxes from a non-Indian logging company doing business on a reservation. The Court observed that strong federal and tribal interests were implicated by the comprehensive federal regulation of the harvesting of Indian timber. Federal statutes provide that the Secretary of the Interior must approve all sales of such timber, and require a determination of where the best interests of the Indian owners of the timber lie in deciding whether to grant approval. 448 U.S. at 145–46, 100 S.Ct. at 2584–85. In addition, the Secretary has promulgated detailed regulations governing the logging and sale of Indian timber in order to promote tribal economic interests more effectively. *Id.* at 147, 100 S.Ct. at 2585.

The *Bracker* Court concluded that "the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed in this case ... There is no room for [the state's] taxes in the comprehensive federal regulatory scheme." *Id.* at 148, 100 S.Ct. at 2586. The imposition of state taxes served to threaten the overriding federal objective, as expressed by the Secretary in his regulations, of assuring Indian tribes the greatest benefit possible from the harvest of their forests. Allowing a state to exact any sort of monetary concession from those conducting logging activities in a Tribe's forest would have necessarily impinged on the profits reaped by the Tribe in connection with those activities. *Id.* at 149, 100 S.Ct. at 2586. Furthermore, allowance of a state

tax would have "undermine[d] the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates with respect to the harvesting and sale of tribal timber." *Id.* at 149, 100 S.Ct. at 2586. The tax would have had this effect because it would have required the Secretary to take into account additional variables, ones whose nature and magnitude would be determined solely by the state, in arriving at the fees to be paid to the non-Indian contractors engaging in logging activities on tribal land.

In contrast to these federal and tribal interests, the State posited only a generalized interest in raising revenue. It did not assert that its taxes would fulfill a legitimate regulatory purpose. Nor did it claim that the tax represented compensation for services provided in connection with the logging activities. *Id.* at 150, 100 S.Ct. at 2587. The Court concluded that the State's desire to share in the benefits of activity conducted within its own borders did not suffice to warrant an impingement of considerable magnitude on the federal and tribal interests embodied in the pervasive scheme for harvesting Indian timber.

In *Ramah Navajo School Bd. v. New Mexico,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the Court similarly invalidated New Mexico's efforts to tax the gross receipts that a non-Indian construction company received from a tribal school board for the construction of a school for Indian children on the tribe's reservation. The Court again noted the existence of a comprehensive federal regulatory scheme, this time one governing the financing and construction of Indian educational institutions, and concluded as it had in *Bracker* that extensive federal involvement of this sort precluded the assertion of additional authority by the State. "The direction and supervision provided by the Federal Government for the construction of Indian schools leave no room for the additional burden sought to be imposed by the State through its taxation...." 458 U.S. at 841–

42, 102 S.Ct. at 3400–01. Because the State had failed to justify its intrusion into an area of manifest federal concern by identifying either a valid regulatory purpose that its tax would further or services provided in connection with the tribal schools that the tax would fund, the Court deemed the State's attempted assertion of taxing authority preempted by federal law. *Id.* at 845, 102 S.Ct. at 3402. *Cf. New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (striking down State's attempt to impose regulations on hunting and fishing by non-Indians on tribal land where federal Government and Tribe together closely supervised such activity in effort to foster Tribe's economic development).

However, the Court has not always perceived the federal, tribal and state interests to weigh in favor of the preemption of state efforts to tax on-reservation activities involving non-Indians. In a trio of decisions, the Court has upheld the imposition of state tobacco taxes on the sale of cigarettes to non-Indians by stores located on tribal reservations. *See Oklahoma Tax Commission v. Potawatomi Indian Tribe,* — U.S. ——, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Washington v. Confederated Tribes of Colville Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

In *Colville,* the Court elaborated on the reasoning underpinning these decisions. The cigarettes sold by reservation stores to non-Indians do not incorporate materials produced on tribal land, nor do the tribes participate in any meaningful way in their design or manufacture. The tribes simply import the cigarettes onto the reservation, where they are sold to individuals who take them back off. The only value the tribes proffer to the general public is the value in not having to pay the state sales tax which would otherwise apply. Neither the federal government nor the Tribes have a legitimate interest, the Court concluded, in marketing this sort of tax loophole.

It is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest. What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation ... We do not believe that principles of federal Indian law ... authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.

*Colville*, 447 U.S. at 155, 100 S.Ct. at 2082.

In *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), the Court similarly perceived the balance of federal, state, and tribal interests to weigh in favor of state taxation. There the Court held that New Mexico could impose its severance taxes on the production of oil and gas by non-Indian lessees from wells located on a tribal reservation. The lessees pointed to federal and tribal laws governing the extraction of minerals from tribal lands which, they claimed, paralleled the regulatory schemes the Court had found to preempt state taxation in *Bracker* and *Ramah*. The *Cotton Petroleum* Court distinguished those earlier precedents, however, because of several factual findings made by the district court in the case before it. That court had found that New Mexico provided substantial services to both the Tribe and its lessees in connection with the tribal drilling operations. The State also regulated those operations. This was not a case, therefore, involving "complete abdication or noninvolvement of the State in the on-reservation activity." 490 U.S. at 185, 109 S.Ct. at 1712. The district court had also found that the Tribe would suffer no economic burden as a result of the State taxes, since the Tribe could in fact increase its own taxes "without adversely affecting on-reservation oil and gas development...." *Id.*

█ In this case, the Tribe alleges active involvement in the production of the entertainment events which take place on its reservation. Not only did the Tribe initially develop the Firebird Lake property and select, after detailed negotiations, the companies that would conduct sporting and theatrical activities there, but it continues to work closely with those companies to ensure that they provide high quality entertainment to the public. Thus, the Tribe alleges that it actively regulates and monitors the Firebird Lake property, enforcing tribal ordinances concerned with water quality, pest control, sanitation and sewage disposal. Exercising its authority under the leases, the Tribe further limits the size of the audiences which may attend performances, approves or rejects proposed additional construction by its lessees, and coordinates law enforcement and security at the events conducted on its land.

That a tribe plays an active role in generating activities of value on its reservation gives it a strong interest in maintaining those activities free from state interference and distinguishes its situation from that of tribes which simply allow the sale of items such as cigarettes to take place on their reservations. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Cabazon*, the Court invalidated California's efforts to exert regulatory authority over bingo games conducted on a tribal reservation. The Court rejected the notion that the tribes in question were merely marketing an exemption from state gambling laws and that, under *Colville*, they lacked the sort of interest in the conduct of the bingo games which would warrant the preemption of state law.

Here the Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians. They have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide. The Tribes

have a strong incentive to provide comfortable, clean, and attractive facilities and well-run games in order to increase attendance at the games.... [T]he Cabazon and Morongo Bands are generating value on the reservations through activities in which they have a substantial interest.

*Cabazon,* 480 U.S. at 219–20, 107 S.Ct. at 1093–94. Like the *Cabazon* tribes, the Tribe here alleges close involvement in the provision of quality entertainment services to the public on its lands. It has therefore asserted an interest in maintaining those services free from state taxation which could support a judgment in its favor.

Furthermore, the Tribe alleges the existence of strong federal interests and a comprehensive federal regulatory scheme governing the development and leasing of its Firebird Lake property. The Tribe asserts that it first constructed the Firebird Lake and Sun Valley Marina complex using federal funds and assistance. The Bureau of Indian Affairs strongly supported the development project as a means of furthering the Tribe's economic well-being. The Tribe's subsequent leasing of the Firebird Lake property to its own tribal corporation and then to the Firebird International Raceway Park and the Compton Terrace corporation required the approval of the Secretary of the Interior pursuant to 25 U.S.C. § 415 (1988).

Section 415 establishes a federal regulatory scheme governing the leasing of tribal lands similar to that described by the *Bracker* Court as controlling the harvesting of Indian timber. It provides that the Secretary of the Interior must authorize all leases of reservation property, and establishes certain factors which the Secretary must consider before giving approval. Included among these factors are the uses to which the land will be put and the effect of those uses on neighboring tribal property, the availability of services appropriate to the maintenance of the uses, and the quality and safety of any structures to be erected pursuant to the leases. As is the case

with timber harvesting, the Secretary has also promulgated detailed regulations governing leasing to ensure "the highest economic return to the [tribal] owner consistent with prudent management and conservation practices...." 25 C.F.R. § 162.8 (1991). These regulations govern the length of leases and the terms under which leases will be approved. 25 C.F.R. §§ 162.1–162.14 (1991). They are of a scope and detail sufficient to support an argument that, as the Supreme Court held in *Bracker* and *Ramah,* there exists no room for additional regulation by the State. The Tribe has thus alleged precisely the sort of federal involvement in the leasing of its Firebird Lake property that could support a claim for the preemption of the State's taxing authority.

The Tribe, finally, has alleged that the factors which led the Supreme Court in *Cotton Petroleum* to reject a challenge to the imposition of state taxes do not exist in this case. The Tribe asserts that Arizona's assessment of a transaction privilege tax will cause it "direct, serious, and irreparable injury and economic loss...." (Complaint ¶ 25). Unlike the tribe in *Cotton Petroleum,* which was found to be entirely unaffected by the taxes at issue in that case, the Tribe here alleges that it receives significant revenues from the theatrical and sporting events that take place on its property, in the form of a base rent paid by its lessees, a percentage of their gross receipts, and a sales tax, and that those revenues would suffer from the imposition of the Arizona tax. The district court found, indeed, in rejecting the State's claim that the Tribe lacked standing to bring this action, that the Tribe "would be affected, in a real economic sense, if [state] taxes were imposed upon [its] tenants." Memorandum Decision at 3.

Furthermore, the Tribe asserts that the state interests which the *Cotton Petroleum* Court considered decisive in conducting its preemption balancing are not present in this case. The *Cotton Petroleum* Court noted that New Mexico had provided sub-

stantial services in connection with the oil and gas drilling activities that it sought to tax, and that it had exerted regulatory authority over those activities. Here, by contrast, the Tribe alleges that "[t]he State sales tax is unrelated to any services rendered to the Tribe by the State.... The State has not asserted regulatory authority over activities at either Firebird or Compton Terrace on the Gila Reservation." (Complaint ¶ 24).

■ In dismissing the Tribe's complaint, the district court lent dispositive weight to the State's assertion, made in its memorandum in support of its Motion to Dismiss, that any criminal charges concerning non-Indians attending the Firebird Lake events, and any tort or contract disputes arising out of those events, would fall under the jurisdiction of the State court system. In doing so, it ignored the elementary principle that a court reviewing a motion to dismiss for failure to state a claim should not look beyond the facts as alleged in the plaintiff's complaint, but should accept those facts as true and construe them in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Abramson v. Brownstein,* 897 F.2d 389, 391 (9th Cir.1990).

Furthermore, even if the district court acted properly in taking into consideration the State's assertions of interest at this early stage of the litigation, those assertions do not warrant dismissal at this point in the proceedings. We have previously held that a State may avoid the preemption of its taxing authority in a case where strong federal and tribal interests exist only if its taxes are "narrowly tailored" to funding the services it provides in connection with the activities taking place on tribal land. *Crow Tribe Of Indians v. Montana,* 819 F.2d 895, 900–902 (9th Cir.1987) (*Crow II*), *summarily aff'd,* 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988); *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1114 (9th Cir.1981) (*Crow I*), *amended,* 665 F.2d 1390 (1982), *cert. denied,* 459

U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). Indeed, in *Hoopa Valley Tribe v. Nevins,* 881 F.2d 657 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990), we rejected the State of California's argument that its timber tax was justified by services including law enforcement which it provided to those affected by the tax, noting that the services pointed to by the State were typically available to all of its citizens and that it had thus failed to establish a "direct connection between revenues from the timber yield tax and the provision of services to tribal members or area residents generally." *Id.* at 661. Although the State may at a later stage of the litigation seek to prove a direct connection between its tax and the law enforcement services it provides for the Firebird Lake performances, the record currently is devoid of any such proof.

Thus, we conclude that the Tribe has stated a cognizable claim that the transaction privilege tax which the State of Arizona seeks to impose on the activities taking place on its reservation is preempted by federal law.

**B.**

■ The Tribe has also alleged facts which, if proved, would suggest that Arizona's tax impermissibly interferes with the Tribe's right to govern itself. The doctrine of tribal self-government, while constituting an independent barrier to the assertion of state taxing authority over activities taking place on tribal reservations, bears some resemblance to that of federal preemption. *Bracker,* 448 U.S. at 142, 100 S.Ct. at 2583. It prohibits "state action [which] infringe[s] on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959). Application of the doctrine requires weighing the state's interest in "rais[ing] revenue to fund state-provided services, both on and off the reservation," *Chemehuevi Indian Tribe v. California State Bd. of Equalization,* 800 F.2d 1446, 1449

(9th Cir.1986), *cert. denied,* 481 U.S. 1051, 107 S.Ct. 2184, 95 L.Ed.2d 840 (1987), against the Tribe's interest in levying its own taxes in order "to provide tribal services on the reservation." *Id.*

The Tribe's "interest in raising revenues for essential governmental programs ... is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State['s] ... interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." *Colville,* 447 U.S. at 156–157, 100 S.Ct. at 2082–2083. Here the Tribe has alleged that the entertainment events which Arizona seeks to tax constitute value generated on its reservation, that it provides significant services to the companies producing those events, and that it exerts considerable control over the events. It has further claimed that the State does not provide any services to those companies. It has stated, finally, that allowance of the State tax will seriously infringe on its ability to govern itself.

■ The Tribe is entitled to prove these allegations on remand. To sustain its claim of impermissible interference with tribal self-government, it will have to show that the State's taxes "substantially affect its ability to offer governmental services or its ability to regulate the development of tribal resources, and that the balance of state and tribal interests renders the state's assertion of taxing authority unreasonable." *Crow I,* 650 F.2d at 1117. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

## IV.

The decision of the district court is REVERSED and the case is REMANDED for further proceedings in which the Tribe will have the opportunity to prove that Arizona's efforts to impose its transaction privilege tax on the entertainment events taking place at Firebird Lake are either preempted by federal law or prohibited by the doctrine of tribal self-government.