**SALT RIVER PIMA–MARICOPA INDIAN COMMUNITY,**
**Plaintiff–Appellant,**

v.

**STATE OF ARIZONA; Paul Waddell, Director of the Arizona Department of Revenue, Defendants–Appellees.**

No. 93–16853.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 15, 1995.

Decided March 21, 1995.

Phillip J. Shea, Shea & Wilks, Phoenix, AZ, for plaintiff-appellant.

Patrick Irvine, Asst. Atty. Gen., Phoenix, AZ, for defendants-appellees.

Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiff Salt River Pima–Maricopa Indian Community ("Community") appeals from a summary judgment for the defendants, the State of Arizona and the Director of the

Arizona Department of Revenue, Paul Waddell ("Arizona" or "State"). The Community argues that the district court erred by holding that the State may collect taxes on sales and rental transactions on the Indian reservation with non-Indians. We affirm.

## FACTS & PRIOR PROCEEDINGS

This case concerns the collection of taxes by Arizona on sales and rentals by non-Indian businesses selling products and services to non-Indians on the Community's reservation. The Community consists of the confederated Pima and Maricopa Tribes of Indians and enjoys official status as a tribe under the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*

A shopping mall, known as the Scottsdale Pavilions, is located on land within the Community's reservation. The land is held in trust by the United States for individual allottees and is leased under two separate lease agreements to a non-Indian land developer, Vestar Development Company. The leases were subject to approval by the Secretary of the Interior. The leases provide that the possession of the land will revert and the buildings and improvements will become the property of the allottees at the end of the lease term of fifty-five years.[1] The leases also provide that any taxes levied by the Community in combination with other applicable taxes will not exceed the total sales taxes in the nearby city of Scottsdale. The allottees receive rents from the developer. The Community acts as the allottees' agent for the payment of rent.

The developer sublet the property to various non-Indian businesses, including Circuit City, Clothestime, Cost Plus Imports, Denny's, J.C. Penney, McDonalds, Taco Bell, Kentucky Fried Chicken, and Home Depot. More than 99 percent of the goods sold at these businesses are produced off-reservation. All of these businesses are owned and managed by non-Indian entities, none of which are residents of the reservation.

Although the Community does not share in the mall's profits or rents, it can and has exercised its right to tax. The Community collects a 1 percent sales tax on gross receipts from sales at the mall. Because of the huge financial success of the mall, the Community's 1 percent tax has resulted in substantial revenues. The gross receipts for 1992 exceeded $100 million and 1993 projections estimated gross receipts of $200 million. Thus, even a 1 percent share of these revenues has resulted in millions in tax revenues for the Community.

The State also collects sales and rental taxes from the subtenants. Sales tax is 5.5 percent on purchases by non-Indians; the tax on rent is 4.5 percent.[2] The State remits .5 percent of its sales tax revenues to Arizona cities and .7616 percent to Arizona counties. The State remits .6 percent of the taxes on gross rents revenues to Arizona Cities and .9139 percent to Arizona counties. The Community does not share in these revenue allocations.

The developer, the State, and the Community all provide services to the mall. The Community provides police protection for the mall. Fire protection is provided by both the Community and the City of Scottsdale, which charges a fee to the businesses that is equivalent to its tax for the service. The Community also conducts health and safety inspections and enforces zoning regulations. The State maintains Pima Road, which lies on the reservation and provides access to the mall. The State is constructing a new highway bordering the reservation, which will include an access ramp to the mall. Electricity is purchased from a state-run utility project. Vestar provides water and sewage. It is undisputed that Arizona and its subordinate entities provide the governmental services used by the non-Indian purchasers off the reservation.

The Community sued in federal court, arguing that the state taxes interfere with its right to impose taxes. In effect, the Community argued that because it acts like a state in providing various governmental services to

---

1. The leases allow the lease term to be extended an additional ten years at the option of the lessee.

2. Sales to members of the Community are not subject to the sales tax. *See* 4 U.S.C. § 109.

the mall's businesses, Arizona's 5.5 percent tax should be preempted. The Community also argued to the district court that because the allocation of the tax revenues were discriminatory, the tax was unlawful.[3]

Both the defendants and the Community moved for summary judgment. The district court granted the defendants' motion and entered judgment for the defendants. This appeal followed.

## JURISDICTION

■ The district court's jurisdiction is based on 28 U.S.C. §§ 1331, 1362. "The barrier posed by 28 U.S.C. § 1341 to suits in federal court challenging the assessment, levy or collection of State taxes does not apply to actions commenced by an Indian tribe." *Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1407 (9th Cir.1992) (citing *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 470–75, 96 S.Ct. 1634, 1639–42, 48 L.Ed.2d 96 (1976); *Hoopa Valley Tribe v. Nevins,* 881 F.2d 657, 659 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990)). This court has appellate jurisdiction under 28 U.S.C. § 1291.

## STANDARDS OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *Jones v. Union Pac. R.R.,* 968 F.2d 937, 940 (9th Cir.1992). We will affirm the district court's grant of summary judgment if, viewing the facts in the light most favorable to the nonmoving party, there are no issues of material fact and summary judgment is appropriate as a matter of law. *Tzung v. State Farm Fire & Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

## DISCUSSION

■ We must decide whether state taxes on the sale of non-Indian[4] goods to a non-

Indian by a non-Indian business on a reservation are preempted when the tribe concurrently taxes and provides some of the governmental services used by the non-Indian businesses. Because the Community's activities did not contribute to the value of the goods sold, and because Arizona provides most of the governmental services used by the non-Indian taxpayers, we affirm.

### I. Preemption

■ To determine whether the State tax on reservation transactions is preempted, the court must make "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). The Supreme Court has identified a number of factors to be considered when determining whether a state tax borne by non-Indians is preempted, including: "the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax." Felix S. Cohen, *Handbook on American Indian Law* 413 (1982) (citing *Central Machinery Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 163–66, 100 S.Ct. 2592, 2994–97, 65 L.Ed.2d 684 (1980); *White Mountain,* 448 U.S. at 141–45, 100 S.Ct. at 2582–85; *Colville,* 447 U.S. at 160–63, 100 S.Ct. at 2084–86). "This makes Indian law preemption broader than traditional preemption: That is, in the Indian law context, state law is preempted not only by an explicit congressional statement—the traditional preemption standard—but also if the balance of federal, state and tribal interest tips in favor of preemption." *In re Blue Lake Forest Prods. Inc.,* 30 F.3d 1138, 1142 (9th Cir.1994) (citing *Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1407–08 (9th Cir.

---

**3.** The Community has abandoned its claim of discriminatory allocation of tax revenues on appeal.

**4.** The term "non-Indian" denotes both Indians who are not members of the Pima–Maricopa

Community and persons who are not Native American Indians. *Colville,* 447 U.S. at 160–61, 100 S.Ct. at 2084–85 (putting Indians on a foreign reservation on same footing as non-Native Americans generally).

1992)), *cert. denied,* —— U.S. ——, 115 S.Ct. 670, 130 L.Ed.2d 603 (1994).

## II. The "Smoke Shop" Cases

■ When state taxes are imposed on the sale of non-Indian products to non-Indians, as is the case here and in the so-called "smoke shop" cases, the preemption balance tips toward state interests.

In *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Supreme Court addressed the issue of whether the state's tax on the sale of cigarettes to non-Indians was preempted when the tribe also sought to tax the same sales.[5] *See also Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (holding that state may impose nondiscriminatory tax on non-Indian customers of Indian retailers doing business on reservation). The Court found that although Congress sought to foster tribal self-government and economic development, it had not gone so far as to preclude state taxation of sales by Indians to nonmembers of the tribe. 447 U.S. at 155, 100 S.Ct. at 2082.

The Court then found that the state's interest outweighed the tribe's:

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The state also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services.

*Id.* at 156–57, 100 S.Ct. at 2082–83. The Court also perceived no conflict between concurrent taxes on non-Indians by the state and the tribe. *Id.* at 158–59, 100 S.Ct. at 2083–84. The *Colville* Court concluded that the tax was not preempted because the state's taxes were "reasonably designed to prevent the Tribes from marketing their tax exemption to nonmembers who do not receive significant tribal services and who would otherwise purchase their cigarettes outside the reservations." *Id.* at 157, 100 S.Ct. at 2083.

In *Chemehuevi Indian Tribe v. California State Board of Equalization,* 800 F.2d 1446 (9th Cir.1986), *cert. denied,* 481 U.S. 1051, 107 S.Ct. 2184, 95 L.Ed.2d 840 (1987), we addressed a "smoke shop" operation like the one in *Colville* and upheld a state cigarette tax on reservation sales to non-Indians. After finding that no federal statute expressly preempted the tax, we found that "the Chemehuevis are not developing and marketing a tribal resource; they are importing a finished product and reselling it to residents and visitors." *Id.* at 1449 (citation omitted). We also rejected the tribe's claim that the state tax would "deprive it of badly needed income," noting that the Ninth Circuit and the Supreme Court have repeatedly held that "reduction of tribal revenues does not invalidate a state tax." *Id.*

Applying these principles to the facts here, it is clear that the balance tips in favor of Arizona's taxation. Most importantly, the goods and services sold are non-Indian, and the legal incidence of Arizona's taxes falls on non-Indians. *See Colville,* 447 U.S. at 151, 100 S.Ct. at 2080 (citing *Moe,* 425 U.S. at 482, 96 S.Ct. at 1645). Furthermore, Arizona and its agents provide the majority of the governmental services used by these taxpayers. Consequently, the State's interest is at its strongest, not its weakest. *Id.,* 447 U.S. at 157, 100 S.Ct. at 2083.

■ We are not persuaded by the Community's claim that it is entitled to a proportional share of the State's receipts. The Supreme Court has rejected the idea that a tax imposed on reservation activities must be proportionate to the services provided to the Indians. In *Cotton Petroleum Corp. v. New Mexico,* the Court observed that,

> Not only would such a proportionality requirement create nightmarish administrative burdens, but it would also be anti-

---

**5.** Because *Colville* is a preemption case, the Community's claim that the district court failed to undertake a preemption analysis because it relied on *Colville* is clearly without basis.

thetical to the traditional notion that taxation is not premised on a strict *quid pro quo* relationship between the taxpayer and the tax collector.

490 U.S. at 185, n. 15, 109 S.Ct. at 1712, n. 15 (citing *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 521–23, 57 S.Ct. 868, 878–79, 81 L.Ed. 1245 (1937)); *see also Chemehuevi*, 800 F.2d at 1450 (stating that "the failure of the state to include the Tribe in its revenue sharing program does not invalidate the state tax" under the Indian Commerce Clause). There may be a limit on state taxation where it effectively prevents appropriate taxation by an Indian tribe. However, that is not the case here; to the extent that the Community has expended its resources on ancillary services at the mall, it appears that it has been more than adequately compensated through the 1 percent sales tax.

The Community attempts to distinguish *Colville* and its progeny by reading these cases extremely narrowly. The Community argues that the "smoke shop" rule applies only to cases in which the tribe is attempting to create a "magnet" effect of drawing customers onto the reservation by offering a lower sales tax rate than the state. However, even if *Colville* could be limited in that manner, which is doubtful given its expansive language, it does not follow that the state tax here should be disallowed. Arizona's ability to tax these sales precludes the Community from creating a tax haven at the mall. *See Colville*, 447 U.S. at 157, 100 S.Ct. at 2083. If we were to disallow the state tax, there is nothing to prevent the Community from "open[ing] chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom from surrounding areas." *Id.* at 155, 100 S.Ct. at 2082. In addition, *Colville*'s reasoning also depends on whether the products sold are of Indian origin. *Id.* This rationale would apply regardless of whether the Community was, in fact, attempting to lure consumers onto the reservation for tax breaks.

The Community also argues that this case is controlled by *Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1407 (9th Cir.1992). In *Gila River*, we found that a state tax was invalid because the tribe's activities contributed value to the service sold. The Gila River Community maintained an active role in the business enterprise by developing and marketing on-reservation entertainment to the general public. It constructed a lake and a marina, and then, after negotiations, selected a developer to sublet and improve the property; these improvements then became the property of the tribe. Finally, the Gila River Community shared in the profits of the enterprise, collected rent, and worked closely with the companies producing the entertainment.

*Gila River* is clearly distinguishable from this case. The mall earns its profits simply by importing non-Indian products onto the reservation for resale to non-Indians. The Community contributes relatively little to the value of the products and services sold at the mall; the businesses are managed and owned by non-Indians, and the Community does not participate in business decisions and does not share in the profits. Consequently, *Gila River* is more akin to cases in which state taxes are preempted because an *Indian* resource or service is being sold, which is not the case here. *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (bingo); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (timber); *Crow Tribe of Indians v. Montana*, 819 F.2d 895, 900–02 (9th Cir. 1987), *aff'd*, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) (coal); *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1114 (9th Cir.1981), *amended*, 665 F.2d 1390 (1982), *cert. denied*, 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982) (coal); *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657 (9th Cir.1989), *cert. denied*, 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990) (timber). *But see Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) (allowing state taxation of oil and gas extraction on reservation because of state's services to and interest in regulating that industry). For these reasons, we find that *Gila River* is not controlling.

### III. Conclusion

In sum, a preemption analysis requires the court to balance federal, state, and tribal

interests to determine whether a state tax violates federal law. The federal government has expressed an interest in assisting tribes in their efforts to achieve economic self-sufficiency. However, that interest does not, without more, defeat a state tax on non-Indians. The Community has an interest in raising revenues, but that interest is at its weakest when goods are imported from off-reservation for sale. The State, too, has an interest in raising revenues, and this interest is at its strongest when non-Indians are taxed, and those taxes are used to provide them with government services. The preemption balance unmistakably tips in favor of the State. We affirm the district court's grant of summary judgment for the defendants.

AFFIRMED.