91 F.3d 1232
 96 Cal. Daily Op. Serv. 5635, 96 Daily Journal
D.A.R. 9215
GILA RIVER INDIAN COMMUNITY, Plaintiff-Appellant,
v.
Paul WADDELL, as Director of the Department of Revenue of
the State of Arizona, Defendant-Appellee.
 No. 94-16972.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 15, 1996.
Decided July 31, 1996.
 
 Rodney B. Lewis, Gila River Indian Community, Sacaton, Arizona, for plaintiff-appellant.
 Patrick Irvine, Assistant Attorney General, Phoenix, Arizona, for defendant-appellee.
 Appeal from the United States District Court for the District of Arizona, Roger G. Strand, District Judge, Presiding. D.C. No. CV-90-00841-RGS.
 Before: REINHARDT, THOMPSON and O'SCANNLAIN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether a state is preempted from imposing a sales tax on entertainment events which take place on an Indian reservation.
 
 
 2
 * Gila River Indian Community ("Tribe") appeals the district court's summary judgment on remand from this court in favor of Paul Waddell, as Director of the Department of Revenue of the State of Arizona. The Tribe seeks declaratory and injunctive relief from the imposition of a tax on the sale of tickets and concessionary items in connection with sporting and cultural activities held at the Tribe's Firebird International Raceway Park and Compton Terrace concert amphitheater, located on the Gila River Indian Reservation ("Reservation").[1]
 
 
 3
 The Tribe comprises the confederated Pima and Maricopa Tribes of Indians and is organized under 25 U.S.C. § 476, the Indian Reorganization Act. The Tribe's Constitution and Bylaws have been approved by the Secretary of the Interior. The Reservation, established by Congress in 1859, borders the Phoenix metropolitan area in Arizona. The United States holds fee title to a majority of the land on the Reservation in trust for the Tribe.
 
 
 4
 In the early 1970s, the Tribe constructed Firebird Lake and Sun Valley Marina on reservation lands (the "Firebird Lake property") with grants and financing obtained from the federal Economic Development Administration. This development program was strongly supported by the Bureau of Indian Affairs ("BIA"). To develop and administer the Firebird Lake property, the Tribe chartered the Sun Valley Marina Corporation ("Sun Valley") which then leased the property from the Tribe.
 
 
 5
 Sun Valley subleased part of the Firebird Lake property to a partnership, the Firebird International Raceway Park ("Firebird") for the operation of motor and aquatic sporting events. In turn, Firebird subleased part of the property to the JBD Corporation d/b/a Compton Terrace ("Compton Terrace") for the operation of an amphitheater for the performing arts. All of the leases incorporate the terms of the master lease from the Tribe to its tribal corporation, Sun Valley.
 
 
 6
 The leases were authorized by the Secretary of the Interior pursuant to 25 U.S.C. § 415 (1988), which provides that the Secretary must review and approve the lease of all lands held in trust for a tribe by the United States. Under the terms of the lease, Firebird pays an annual guaranteed rental, and an additional percentage rental if gross receipts exceed certain levels. Compton Terrace pays Firebird six percent of all gross ticket sales and, beginning in year six of the lease, will pay a guaranteed base rental. Neither Firebird's nor Compton Terrace's rent payments have ever exceeded the guaranteed base rental.
 
 
 7
 In accordance with the terms of the sublease, Compton Terrace constructed capital improvements on the property that included an amphitheater, restrooms, and dressing and commissary facilities. Firebird constructed food concession buildings, restrooms, grading for a parking lot, security lighting, fencing, and a road to the parking areas. Pursuant to the leases, these improvements belong to the Tribe.
 
 
 8
 Entertainment events held at Firebird Lake and Compton Terrace are advertised outside the Community, and the majority of tickets for events at both facilities are purchased off-Reservation. Indeed, less than 5% of the visitors to either facility are members of the Tribe. Programs, souvenirs, and concession items sold at Firebird Lake and Compton Terrace are printed, manufactured or made outside the Reservation. These items, as well as the tickets to the events, are taxed by the Tribe.
 
 
 9
 Tribal approval is not required for events at either Firebird Raceway or Compton Terrace, and neither the Tribe nor the BIA has the authority to veto any particular event. The Tribe is not involved in determining, on the basis of entertainment value, which events will take place. However, it may close down an event to protect the public safety if circumstances require such action.
 
 
 10
 Police protection at the entertainment events is provided through the non-Indian lessees by state and county police officers specifically invited to work in cooperation with the BIA Law Enforcement Services. State police have repeatedly conducted drug and alcohol enforcement operations at the events at State and county expense. In addition, the Highway Patrol Division of the Arizona Department of Public Safety and the Freeway Operations Alert Team of the Arizona Department of Transportation have assigned officers, also at State expense, to provide traffic control at many Compton Terrace concerts.
 
 
 11
 The Tribe imposes a tax of one and one-half percent (1 1/2%) of gross proceeds of sale or gross income from amusements, including concerts and races. G.R.I.C.Code § 13.303.
 
 
 12
 The State assessed its transaction privilege tax of five percent on Compton Terrace's ticket revenues during the 1987 and 1988 seasons. This assessment was upheld by the Arizona Board of Tax Appeals and was appealed to the Arizona Tax Court (No. TX91-00183). The parties have reached a settlement regarding the assessment with a compromise as to tax liability for the period from May 1984 through October 1992. As part of the settlement, Compton Terrace agreed to file timely, with payment, all Arizona transaction privilege tax returns beginning with the tax period November 1992.
 
 
 13
 The State also assessed Firebird a tax on ticket revenues from events held at Firebird Lake from 1983 through 1990. Firebird appealed this assessment to the Arizona Board of Tax Appeals (No. 851-91-S/U). The assessment has now been settled by the parties, with a compromise as to tax liability for the period May 1983 through May 1992. As part of the settlement, Firebird agreed to file timely all Arizona transaction privilege tax returns beginning with the tax period June 1992 and to pay the taxes due.
 
 
 14
 The Tribe filed this action seeking declaratory and injunctive relief against the imposition of the State sales tax on events occurring on its reservation. The Tribe alleged that the sales tax is preempted by federal law and that it infringes upon tribal sovereignty. The district court dismissed the complaint for failure to state a claim. This court reversed, finding that the facts alleged in the complaint, if proved, were sufficient to support the Tribe's cause of action. Gila River I, 967 F.2d at 1413.
 
 
 15
 Upon remand, the district court granted summary judgment for Arizona, finding that the state tax would not interfere with the use or development of tribal property, that the State was involved in the on-Reservation activities, and that the tax is imposed on non-Indians and will be passed on to non-Indian non-residents of the Reservation as part of their ticket price. The district court further found that there was no evidence to support the Tribe's assertion that the state tax would infringe on tribal sovereignty. The Tribe timely appealed.
 
 II
 
 16
 The Tribe contends that the State of Arizona is precluded from imposing its transaction privilege tax on entertainment events on the Reservation because the federal government has exclusive authority over relations with Indian tribes.
 
 
 17
 The federal government's exclusive authority over relations with Indian tribes and the status of tribes gives rise to two independent barriers to the assertion of state regulatory authority over Indian reservations. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43, 100 S.Ct. 2578, 2582-84, 65 L.Ed.2d 665 (1980). The application of a state tax to reservation activities may be barred either because the tax is preempted or because it infringes the right of reservation Indians to make their own laws and be ruled by them. Id.
 
 
 18
 The standard preemption analysis is inapplicable to cases involving Indian law. Rather, when a state "asserts authority over the conduct of non-Indians engaging in activity on the reservation," it is necessary to engage in a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." Bracker, 448 U.S. at 144-45, 100 S.Ct. at 2584. Thus, "in the Indian law context, state law is preempted not only by an explicit congressional statement--the traditional preemption standard--but also if the balance of federal, state and tribal interests tips in favor of preemption." In re Blue Lake Forest Prods. Inc., 30 F.3d 1138, 1142 (9th Cir.1994) (citing Gila River, 967 F.2d at 1407-08), cert. denied, 513 U.S. 1059, 115 S.Ct. 670, 130 L.Ed.2d 603 (1994). "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983).
 
 
 19
 In conducting this balancing of federal, tribal, and state interests, the Court has added that "[t]he traditional notions of Indian sovereignty provide a crucial 'backdrop' against which any assertion of state authority must be assessed." Id. at 334-35, 103 S.Ct. at 2386-87. This "backdrop" requirement has been explained as a "demand[ ] that treaties and federal statutes be interpreted 'generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.' " Vine Deloria, Jr. & Clifford M. Lytle, American Indians, American Justice 207 (University of Texas Press 1983) (citing Bracker, 448 U.S. at 144, 100 S.Ct. at 2584).
 
 
 20
 This case is controlled by our recent decision in Salt River Pima-Maricopa Indian Community v. State of Arizona, 50 F.3d 734 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 186, 133 L.Ed.2d 123 (1995), in which we held that state taxes on the sale of non-Indian goods to non-Indians by a non-Indian business on a reservation are not preempted when the tribe does not contribute to the value of the goods sold and provides only some of the governmental services used by the non-Indian businesses.1
 
 
 21
 The Tribe argues that Arizona's transaction privilege tax implicates both the interest of the federal government in promoting Indian economic development and the comprehensive regulatory scheme governing the leasing of Indian lands.
 
 
 22
 The promotion of tribal economic development has long been recognized as an important federal interest. However, as noted by the State, the Supreme Court has rejected it as an overriding force preempting an otherwise valid state tax on non-Indians. Washington v. Confederated Tribes of the Colville Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), upheld a sales tax on cigarettes sold to non-Indians despite the large tribal revenues generated by the tribal stores and the severe economic impact of the state tax. Although recognizing a congressional concern with fostering tribal economic development, the Court held that "none goes so far as to grant tribal enterprises selling goods to non-members an artificial competitive advantage over all business in the state." 447 U.S. at 155, 100 S.Ct. at 2082.
 
 
 23
 This principle was confirmed in Cotton Petroleum v. New Mexico, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), where the Court rejected a rule which would hold that "any adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the state tax." Id. at 187, 109 S.Ct. at 1713. In Salt River, this court stated that although "the federal government has expressed an interest in assisting tribes in their efforts to achieve economic self-sufficiency ... that interest does not, without more, defeat a state tax on non-Indians." 50 F.3d at 739.
 
 
 24
 The Tribe also contends that the federal statutes authorizing the leasing of trust lands and the regulations governing such leasing constitute a comprehensive regulatory scheme with preemptive effect on state laws. This regulatory scheme is similarly insufficient to preempt a state tax imposed on non-Indians for transactions with other non-Indians. Although Segundo v. City of Rancho Mirage, 813 F.2d 1387 (9th Cir.1987), recognized that conflicting state and tribal regulations of the use of land may result in the preemption of state rules, it also recognized that this conflict does not apply to "the field of taxation where the laws of both State and Tribe may be enforced simultaneously." Id. at 1393. Thus, the Tribe's argument that the mere existence of federal oversight over leasing of Indian lands preempts a state tax is without support.
 
 
 25
 In Salt River, this court rejected the argument that leasing statutes required preemption of the Arizona tax on retail sales and rents received from subtenants. 50 F.3d at 737-39. Here, the state tax is imposed on receipts from non-Indian, off-Reservation residents who pay to see performers and racers who are also from off-Reservation.
 
 
 26
 The Arizona sales tax would not interfere with the use and development of the Tribe's property. Thus, the regulatory scheme that governs the leasing of Indian lands does not require the preemption of the tax. The federal interests asserted by the Tribe are insufficient to preempt a state tax imposed on non-Indians.
 
 2
 
 27
 The Tribe contends that a state tax on entertainment events held on the reservation would directly and substantially harm its economic and sovereign interests. It insists that the interests in this case are particularly significant because the entertainment events at issue are performed and consumed entirely on the Reservation, and because the Tribe is actively involved in the production of the events.
 
 
 28
 In California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1986), the Supreme Court invalidated California's efforts to exert regulatory authority over bingo games conducted on a tribal reservation, rejecting the notion that the tribes in question were merely marketing an exemption from state gambling laws, and deeming the level of the tribes' involvement in the on-reservation activity an important factor in the assessment of tribal interests. As indicated by this circuit in Gila River I:[2]
 
 
 29
 That a tribe plays an active role in generating activities of value on its reservation gives it a strong interest in maintaining those activities free from state interference and distinguishes its situation from that of tribes which simply allow the sale of items such as cigarettes to take place on their reservations. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).
 
 
 30
 967 F.2d at 1410.
 
 
 31
 Here, the Tribe asserts that it has played an active role in generating activities of value on its Reservation. Not only did it construct the facilities, it also continues actively to regulate and to monitor the property, enforcing tribal ordinances concerned with water quality, pest control, sanitation, sewage disposal, and safety.
 
 
 32
 Although the Tribe has established some level of involvement, its assertions regarding its "active role in generating activities of value on the reservation" are unsupported by the record. There is no evidence to support the statement that the Tribe "works closely with [Compton Terrace & Firebird] to ensure that they provide high quality entertainment to the public." This assertion implies that the Tribe is involved in the business decisions regarding which groups will perform on the Reservation, when the record reveals that the Tribe is not involved in any way in such deliberations. Neither Firebird nor Compton Terrace must obtain Community approval before staging events. The Tribe's "veto control" consists only of the ability to shut down events already scheduled at Firebird Lake and Compton Terrace when issues of public safety arise. The Tribe's role is limited to providing clean and safe facilities.
 
 
 33
 Even if we were to find the Tribe's contributions significant, tribal involvement is but one of the factors to be considered in the preemption analysis; it is not dispositive. In Cabazon, the Court's decision to preempt state involvement was also influenced by the fact that the bingo games were "a major source of employment for tribal members," and the profits "the Tribes' sole source of income." 480 U.S. at 218-19, 107 S.Ct. at 1093-94. Neither of those factors is present here. Despite the Tribe's contention to the contrary, neither Compton Terrace nor Firebird Raceway afford significant employment opportunities to members of the Tribe. There is nothing in the record to indicate that Firebird employed any tribal members, nor that Compton Terrace employed more than six members at various times between 1985 and 1991. There is also no evidence in the record to indicate that the profits from these facilities are the Tribe's sole source of income.
 
 
 34
 The extent of the Tribe's involvement in reservation events is not sufficient to shift the balance in the preemption inquiry significantly.
 
 3
 
 35
 Finally, the Tribe maintains that the State has no interest that justifies the imposition of its tax on the entertainment events occurring on the Reservation and that the tax is unrelated to any services rendered to the Tribe by the State.
 
 
 36
 The Tribe's contentions are without merit. The State provides a number of governmental functions critical to the success of Compton Terrace and Firebird events. Law enforcement services are provided at state expense. This police protection is essential to the maintenance of order at events drawing such large groups of non-Indians since the Tribe and federal government lack the criminal jurisdiction over crimes between non-Indians. In addition, the Arizona Highway Patrol and Department of Transportation provide traffic control services required by the events, also at state expense. Finally, the State exercises concurrent jurisdiction with the Tribe with respect to liquor sales, and provides a forum for the resolution of civil and criminal litigation between non-Indians arising on the Reservation. This State involvement constitutes an "interest" which justifies taxing the beneficiaries of those services.
 
 
 37
 The Tribe's insistence that there be a direct connection between the state sales tax revenues and the services provided to the Tribe is similarly meritless. As observed in Salt River, the Supreme Court has noted that there is no requirement that a tax imposed on non-Indians for reservation activities be proportional to the services provided by the State:
 
 
 38
 Not only would such a proportionality requirement create nightmarish administrative burdens, but it would also be antithetical to the traditional notion that taxation is not premised on a strict quid pro quo relationship between the taxpayer and the tax collector.
 
 
 39
 50 F.3d at 737 (citing Cotton Petroleum, 490 U.S. at 185, n. 15, 109 S.Ct. at 1712, n. 15).
 
 
 40
 The State's interests are sufficient to justify the imposition of its tax on the entertainment events. Even against a "backdrop of Indian sovereignty," the balance of federal, tribal, and state interests present in this matter weighs against preemption of the state tax.
 
 III
 
 41
 In addition to its preemption contentions, the Tribe argues that the proposed state tax would interfere with tribal self-government and that payment of the state taxes would adversely impact the Tribe's economic future.
 
 
 42
 This court has held that "[t]he self-government doctrine differs from the preemption analysis and is an independent barrier to state regulation." Crow Tribe of Indians v. Montana, 819 F.2d 895, 902 (9th Cir.), aff'd, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) ("Crow II "). Either is a "sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." Bracker, 448 U.S. at 143, 100 S.Ct. at 2583. Whether a state tax infringes on tribal sovereignty depends on the extent to which tribal self-government is affected. See Crow II, 819 F.2d at 902.
 
 
 43
 The Tribe insists that the imposition of the state tax undermines its efforts to implement its own comprehensive tax program and would reduce tribal revenue. Specifically, the Tribe asserts that the state tax would not only cripple parties currently conducting business on the Reservation, but would also discourage potential employers and taxpayers from locating there.
 
 
 44
 We are not persuaded. The State and the Tribe have concurrent taxing jurisdiction with respect to transactions between non-Indians. Accordingly, the Tribe's tax program is not undermined by the state tax. In addition, as in Salt River, the tax will have very little, if any, effect on the Tribe since the entire amount is passed on to the non-Indian ticket purchaser. 50 F.3d at 737. Even if the Tribe is somehow affected, however, the Ninth Circuit and Supreme Court have repeatedly held that "reduction of tribal revenues does not invalidate a state tax." Id. (citing Chemehuevi Indian Tribe v. California State Board of Equalization, 800 F.2d 1446 (9th Cir.1986), cert. denied, 481 U.S. 1051, 107 S.Ct. 2184, 95 L.Ed.2d 840 (1987)). Moreover, the mere fact that a tax upon a non-Indian may ultimately have an economic impact on a tribe is not sufficient to defeat the tax. Agua Caliente Band of Mission Indians v. County of Riverside, 442 F.2d 1184 (9th Cir.1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). The Tribe's assertions regarding ultimate economic harm are too speculative to merit much weight.
 
 
 45
 The Tribe has failed to establish that the State's taxes "substantially affect its ability to offer governmental services or its ability to regulate the development of tribal resources, and that the balance of state and tribal interests renders the state's assertion of taxing authority unreasonable." Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1117 (9th Cir.), amended, 665 F.2d 1390 (9th Cir.1981), cert. denied, 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982) ("Crow I ").
 
 IV
 
 46
 In Gila River II, as in Salt River, the preemption balance of federal, state, and tribal interests unmistakably tips toward state interests. Accordingly, we affirm the district court's entry of summary judgment for Waddell.
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 In Gila River Indian Community v. Waddell, 967 F.2d 1404 (9th Cir.1992) ("Gila River I "), upon reviewing the district court's dismissal of the Tribe's action for declaratory and injunctive relief, we held that the Tribe had stated a cognizable claim that the doctrines of federal preemption and tribal sovereignty precluded the state from levying the taxes in question, and that the Tribe is entitled to prove its claim of impermissible interference with tribal self-government
 
 
 [2]
 It must be noted that in Salt River we inadvertently overstated our finding in Gila River I. In distinguishing the two cases, we said: "In Gila River, we found that a state tax was invalid because the tribe's activities contributed value to the service sold." 50 F.3d at 738. That was not the finding in Gila River I, and it is not the law of the case. In Gila River I, we held only that the tribe had stated a cognizable claim that doctrines of federal preemption and tribal sovereignty precluded the state from levying the taxes in question. 967 F.2d at 1411-1413. We did not reach the merits of the case. It is our duty to do so now, when we encounter the case on appeal after remand. The facts we recite in Gila River II are controlling, not the assertions we made in Gila River I