DAVID R. THOMPSON, Circuit Judge.
Appellant Douglas N. Stuart contracted to buy Indian reservation land from Steven Magpie, Maxine Magpie Rutherford Clifford, and Harry W. Magpie (the Magpies). The land sale contract specified the Magpies would hold title to the land until Stuart made his last installment payment. After Stuart defaulted on several payments, the Bureau of Indian Affairs (BIA) cancelled Stuart’s contract.
Stuart filed a petition for review in the federal district court. He argued: (1) due process required the BIA to give him an opportunity to be heard before cancelling his contract; (2) the BIA violated Stuart’s due process rights when it cancelled the contract without giving him sixty-days notice; (3) the Secretary of the Interior violated his duties as trustee to Stuart by cancelling the contract; (4) the BIA decision conflicted with Montana state anti-forfeiture laws. The district court granted summary judgment in favor of the BIA on all four of Stuart’s claims. Stuart appeals.
*1383 We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
I
FACTS
In 1982, the Magpies, enrolled members of a federally-recognized Indian tribe, contracted to sell 4,119 acres of land located on the Fort Belknap Indian Reservation to Stuart for $555,296. Stuart has one-eighth Native American blood, but is not enrolled in a federally-recognized tribe. Because the land is on an Indian reservation, it is held in trust by the United States.
Under the terms of the land sale contract, Stuart was required to pay $60,000 on January 5 of each year for ten years. The remaining balance was due on January 5, 1992. Between 1982 and 1992, Stuart was entitled to possess the land, but the deed to the land remained with the Magpies until Stuart made full payment. The contract contained a default provision allowing cancellation without notice upon Stuart’s default.[1]
In 1986, Stuart began to fall behind in his payments, and the BIA issued three notices of payment delinquencies. Stuart subsequently provided partial copies of proofs of direct payments for 1988. Nevertheless, Stuart remained in default of the contract.
In April 1989, Stuart and the Magpies amended the 1982 contract to extend the final contract payoff date. The 1989 amended contract contained a new default provision, which allowed the Magpies to cancel the contract upon default after giving sixty-days notice.[2] The 1989 amendment also contained a clause stating that the amendment supplemented the original 1982 contract.[3]
Stuart failed to make an annual payment of $60,000 due on March 1, 1990. The BIA notified Stuart that he was in default and gave him ten days to show cause why the contract should not be cancelled and the land returned to the Magpies. When Stuart failed to cure the default, the BIA issued formal letters cancelling the contract. However, Stuart filed for bankruptcy, and the bankruptcy court voided the BIA’s cancellation because it violated the automatic stay provisions of 11 U.S.C. § 362.
With the amended contract once again in force, Stuart failed to pay the annual payment for 1991. The parties then agreed to a second amendment to the contract, under which the Magpies accepted Stuart’s past partial payments, and permitted him to make smaller annual payments.
This accommodation to Stuart was also to no avail. He failed to make the restructured payments due for 1991,1992,1993, and 1994. The Magpies finally asked the BIA to terminate the contract. On February 9, 1995, the BIA sent Stuart a notice of default. Stuart appealed the notice to the Area Director of the BIA.
In April 1995, Maxine Magpie wrote to the BIA requesting that the Magpies be allowed to regain control of their land immediately because of the poor condition of the farm *1384 land. After an inspection, the Fort Belknap BIA Superintendent confirmed that the entire farmland was infested with weeds. The Superintendent recommended that the BIA take immediate control of the property to control the weed problem and repair the fence line.
Stuart responded by writing a letter to the Acting Director indicating that he wished to work with the BIA to develop a burn plan to destroy the weeds and restore the lands to farming condition. Stuart also stated that he intended to lease the land in order to generate income.
On April 20,1995, the Area Director of the BIA notified Stuart that the cancellation decision of the Superintendent would be placed into immediate effect, pursuant to 25 C.F.R. 2.6(a).[4] The Area Director found that immediate cancellation was required because of the deteriorating condition of the farmland.
Stuart petitioned for review in the district court. The district court granted summary judgment in favor of the BIA, and this appeal followed.
II
DISCUSSION
We review de novo the district court’s grant of summary judgment. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). We will affirm a district court’s summary judgment if there is no genuine issue as to any material fact, Federal Rule of Civil Procedure 56(c), and the district court correctly applied the relevant substantive law. See Bagdadi, 84 F.3d at 1197.
The parties agree on the facts. Therefore, we consider whether the district court correctly applied the relevant substantive law.
A. Due Process
The central issue in this appeal is whether the BIA violated Stuart’s due process rights when it cancelled his contract. Stuart argues: (1) the BIA regulations violate due process on their face because they do not require the BIA to hold a hearing before cancelling a contract; and (2) the BIA Area Director violated due process when he exercised his discretion under 25 C.F.R. § 2.6(a) to finalize the cancellation of Stuart’s contract.
The due process clause of the Fifth Amendment guarantees that “no person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. V.
We review de novo whether the BIA’s procedures violate the due process clause. See Gilbert v. National Transp. Safety Bd., 80 F.3d 364, 367 (9th Cir.1996).
1. Facial Challenge
Stuart argues the applicable BIA regulations violate due process on their face because they do not require the BIA to hold a hearing before depriving a purchaser of his property interest in a land sale contract.
Neither the statute nor the regulations that govern the sale of Indian land require the BIA to hold a hearing before cancelling an installment land sale contract. The relevant statute, 25 U.S.C. § 372, states only that if a buyer defaults on a land sale contract, the amount theretofore paid “shall be forfeited.”[5] The applicable regulation, 25 *1385 C.F.R. § 152.35, requires only that, “[i]f the purchaser on any deferred payment plan makes default in the first or subsequent payments, all payments, including interest, previously made -will be forfeited to the Indian owner.” 25 C.F.R. § 152.35.
We consider three factors in determining whether the statute and regulation violate due process because they fail to require a hearing: (1) “the private interest that will be affected by the official action”; (2) “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards”; and (3) “the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
(a)The Private Interest
A purchaser in an installment land sale contract will have a substantial property interest in the land he is buying, both from the contract and from the payments he makes under it. Here, for example, Stuart paid the Magpies $500,000 in installment payments. Although most of these payments went to pay interest and Stuart had the use of the land for 13 years, nevertheless he had a substantial property interest in the land.
(b)Risk of Erroneous Deprivation
Our assessment of the risk of erroneous deprivation involves a consideration of the “fairness and reliability of the existing pre-[deprivation] procedures, and the probable value, if any of additional procedural safeguards.” Mathews, 424 U.S. at 343, 96 S.Ct. at 907.
The BIA maintains a detailed paper record of all payments and defaults. See id. at 345, 96 S.Ct. at 907-08. In addition, it ensures through correspondence with the buyer that all of the buyer’s payments are documented. A buyer who believes he has made a payment which has gone unrecorded may establish his payments through cancelled checks or other documentary evidence before cancellation proceedings are begun. A hearing for the presentation of this evidence is not necessary to assess the question whether the buyer is in default.
The risk of an erroneous deprivation is further diminished by a purchaser’s right to appeal within the agency. A buyer may appeal a cancellation decision by filing a written notice of appeal in the office of the BIA official whose decision is being appealed. 25 C.F.R. § 2.9(a). The BIA supervisory official that considers the appeal must issue a written decision in all cases appealed within 60 days after all time for written pleadings has expired. 25 C.F.R. § 2.19(a). The buyer may then appeal that official’s decision to the Internal Bureau of Indian Affairs (IBIA), or alternately, directly in federal district court.
Given these procedures, the risk of an erroneous deprivation is low.
(c)The Government Interest
The third factor is the extent of the “administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right,” an administrative hearing. Mathews, 424 U.S. at 347, 96 S.Ct. at 909.
The cost to the government of requiring hearings before the cancellation of every installment land sale contract would be high. See id. (observing that “experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden [is not] ... insubstantial.”).
We conclude that although a buyer under a land sale contract has a substantial interest in the land he is buying, neither the relevant statute nor the regulations, on their face, violate due process by permitting cancellation of the land sale contract without a precancellation hearing. On balance, the value of such a hearing in insuring accuracy is low, while the cost of such a procedure is high. See Mathews, 424 U.S. at 348, 96 S.Ct. at 909.
*1386 2. Immediate Cancellation As Applied To Stuart
Typically, while a buyer’s appeal is pending, the cancellation decision is not considered final, and the installment buyer retains control of the land. 25 C.F.R. § 2.6(a). However, when “the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately,” the official can make his decision immediately effective. Id. If the BIA official makes this decision pursuant to section 2.6(a) of the regulations, the land reverts immediately to the sellers.
This type of summary cancellation “may be justified in emergency situations.” Hodel v. Virginia Surface Mining and Reclamation Assoc., Inc., 452 U.S. 264, 300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981). A BIA official may exercise his discretion to expedite the finality of a BIA decision if public health and safety so require. See id.; see also Armendariz v. Penman, 31 F.3d 860, 866 (9th Cir.1994).
In this case, while Stuart’s appeal was pending in the BIA, the Area Director finalized the cancellation of Stuart’s contract when he found that the land was overrun by a serious weed problem which would preclude its use as farmland. The Area Director believed that the extensive weeds would require a lengthy program of burning, growing crops, and treatment with chemicals before the land could produce enough crops to be leased for fair market value. Also, the Area Director noted that, because of the “highly erodible” soils on the land, a break in growing crops because of the need to burn the weeds could jeopardize inclusion of the land in a federal program important to its value.
Stuart does not quarrel with the factual findings of the Area Director. Rather, he argues that, because he had presented a weed-killing plan and stated his intention to lease the land, the weed problem did not constitute enough of an emergency for the Area Director to finalize the cancellation decision.[6]
We disagree. Although Stuart presented the BIA with a weed-killing plan, given Stuart’s persistent failure to meet his obligations over the years and the deteriorating condition of the farmland, we cannot fault the Area Director for rejecting Stuart’s proposal and concluding that the land must either be returned to the Magpies or leased in order to restore it to farming condition. The Area Director’s exercise of discretion to immediately cancel Stuart’s contract did not violate due process.
B. Contractual Right To Notice
Stuart next argues his land sale contract with the Magpies required the BIA to provide him with sixty-days notice before cancellation. Our reading of the contract, however, indicates it does not require such notice.
The 1982 contract contained a default provision that allowed the BIA to cancel Stuart’s contract in the event of default. The 1982 default provision did not require the BIA to notify Stuart before cancelling his contract.
The 1989 amendment contained a new default provision that allowed the Magpies to cancel after giving sixty-days notice. However, by the explicit terms of the 1989 contract, that contract supplemented the original 1982 contract. After the 1989 amendment, either the Magpies (after giving sixty-days notice) or the BIA (without notice) could cancel Stuart’s contract if he defaulted in his payments.
*1387 Further, Stuart’s contract and the amendments were prepared and approved by the BIA against the backdrop of the relevant statute and regulations. Neither the statute nor the regulations require the BIA to give notice before cancelling a land sale contract. See 25 U.S.C. § 372 (stating that if purchaser fails to comply with terms of sale, the amount he has already paid is forfeited); 25 C.F.R. § 152.35 (stating that if purchaser on deferred payment plan defaults in any payment, all payments are forfeited to seller).
We conclude, as did the district court, that the BIA was not required to give sixty days notice before cancelling Stuart’s land sale contract.
C. Trust Obligation
The Supreme Court has repeatedly recognized the “distinctive obligation of trust incumbent on the Government in its dealings with [Indians].” Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); see also United States v. Mitchell, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). The general trust statutes in Title 25 grant the Department of the Interior broad authority “to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States.” United States v. Eberhardt, 789 F.2d 1354, 1360 (9th Cir. 1986). As part of the Department of the Interior, the BIA supervises and manages Indian property.
According to Stuart, the BIA violated its trust obligation to him in two ways: (1) the BIA denied him a pre-deprivation hearing, and (2) the BIA Area Director exercised his discretion to cancel Stuart’s contract without a hearing, and without giving Stuart the opportunity to present a statement of reasons supporting his appeal.
We hold the government did not breach any trust obligation to Stuart. First of all, the BIA did not violate Stuart’s due process rights when it cancelled his contract. See supra. Further, when the BIA cancelled the contract, it acted pursuant to its rights and duties under the relevant statute and regulations, rights and duties which were neither proscribed nor limited by the contract. Cf. Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 721 (8th Cir.1979) (holding that the BIA violated its trust obligation when it failed to comply with its own regulations).
D. Montana’s State Anti-Forfeiture Law
Stuart argues the BIA violated Montana’s anti-forfeiture statute, Mont.Code Ann. § 28-1-104 (1993), when the BIA allowed the Magpies to repossess the land and retain the money Stuart had paid under his contract. The BIA argues in response that Montana state law was preempted by federal law.
Typically, we do not employ “[t]he standard preemption analysis ... to cases involving Indian law.” Gila River Indian Community v. Waddell, 91 F.3d 1232, 1236 (9th Cir.1996). Rather, we “engage in a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.” Id. (internal citation and quotation omitted).
The present case involves the sale of Indian trust lands between an Indian seller and an Indian buyer.[7] Such a land sale does not implicate Indian tribal sovereignty in any way. Cf. Oklahoma Tax Comm’n v. Sac and Fox Nation, 508 U.S. 114, 124, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (stating that “the tradition of Indian sovereignty requires that the rule [of requiring Congress to clearly express exemptions from tax laws] be reversed when a State attempts to assert tax jurisdiction over an Indian tribe or tribal members living and working on land set aside for those members.”); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 148-50, 100 S.Ct. 2578, 2586-87, 65 L.Ed.2d 665 (1980) (holding that state taxation of Indian *1388 tribal logging company was preempted by federal law). Regardless of whether the Magpies or Stuart own the land, the land would not be in non-Indian hands. Cf. In re Blue Lake Forest Products, Inc., 30 F.3d 1138, 1141-42 (9th Cir.), cert. denied, 513 U.S. 1059, 115 S.Ct. 670, 130 L.Ed.2d 603 (1994) (observing that, “[w]hen on-reservation conduct involves both Indians and non-Indians, we must undertake a particularized inquiry into the state, federal, and tribal interests at stake”) (internal citation and quotation omitted). Because the present case does not implicate tribal sovereignty, the only balance we must strike here is the traditional preemption analysis balance between state and federal interests.
“Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority,” such as the BIA, “may pre-empt state regulation.” Louisiana Public Service Comm’n v. Federal Communications Comm’n, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369 (1986).
Here, the conflict between Montana anti-forfeiture law and federal law is direct. See Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (holding “[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is when it is impossible to comply with both state and federal law”).
Montana Code § 28-1-104 provides:
Whenever by the terms of an obligation a party thereto incurs a forfeiture or a loss in the nature of a forfeiture by reason of his failure to comply with its provisions, he may be relieved therefrom upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.
Montana courts have applied section 28-1-104 to grant relief to buyers in default when fairness and justice require it. See Blakely v. Kelstrup, 267 Mont. 274, 277, 883 P.2d 814 (1994). Pursuant to section 28-1-104, Stuart could be forgiven for his default, and thus, recover some of his past payments under the installment land sale contract. Id. (stating that, under Montana law, “forfeitures are abhorred.”) (citing Yellowstone County v. Wight, 115 Mont. 411, 417-18, 145 P.2d 516 (1944)).
In stark contrast, under the clear meaning of the applicable federal law, 25 U.S.C. § 372 and 25 C.F.R. § 152.35, as well as the terms of Stuart’s land sale contract, which was drafted according to federal law, once Stuart was in default under the contract, all of his previous payments were forfeited to the Magpies.
Because of the direct conflict between federal and state law, we hold federal law preempts the Montana anti-forfeiture statute in the context of installment land sale contracts of Indian reservation land.
AFFIRMED.

. The default provision stated:
The purchaser agrees that upon default of this contract and payments of said note or the interest thereon, this contract for sale and note may be canceled at the option of the Secretary of the Interior, and in such event the amount paid by the purchaser, his heirs or devisees, together with all interest paid on such deferred installments, shall be forfeited as provided by the Act of April 30, 1934 (48 Stat. 647), for the use of the seller, his heirs or devisees.

. The 1989 default provision provides:
In the event that Purchaser defaults in making payment when due, or otherwise fails to comply with any other covenant, term or condition on their part herein contained, Seller may, at their election, give sixty (60) days notice in writing to Purchaser of the claimed default or defaults. The notice shall be sufficient for all purposes if it describes the default in general terms. If all of the defaults are not cured and corrected within the sixty (60) day period, then, without further notice of any kind, Seller may, at their option, elect:
(a) That this contract be immediately can-celled and terminated ...
jfc * K * * *
(b) Seller may, at their option, have the alternative to pursue any other remedies allowed them under the laws of the State of Montana to terminate or enforce said agreement.

. The 1989 amendment stated that, in all other respects, “the terms as originally set forth in [the] original [contract] ... will be binding upon the parties hereto and remain unchanged.”

. 25 C.F.R. § 2.6(a) provides, in pertinent part:
No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final ... unless when an appeal is filed, the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately.

. 25 U.S.C. § 372 states, in pertinent part:
All sales of lands allotted to Indians authorized by this or any other Act shall be made under such rules and regulations and upon such terms as the Secretary of the Interior may prescribe.... Should the purchaser fail to comply with the terms of sale prescribed by the Secretary of the Interior, the amount so paid shall be forfeited.... All forfeitures shall inure to the benefit of the allottee or his heirs. Upon payment of the purchase price in full, the Secretary of the Interior shall cause to be issued to the purchaser patent in fee for such land.

. Despite Stuart’s argument to the contraiy, the Area Director’s decision to finalize the cancellation decision while Stuart’s appeal was pending, and before Stuart's period to file his statement of reasons had run, did not violate BIA regulations. 25 C.F.R. § 2.10 requires an appellant like Stuart to file a statement of reasons, and grants a thirty-day extension if the statement of reasons is not filed with the notice of appeal. When the Area Director finalized the Superintendent's cancellation of Stuart’s contract, the Area Director had not yet received Stuart’s statement of reasons. However, the regulation section that allows the Area Director to exercise his discretion to cancel the contract immediately, 25 C.F.R. § 2.6(a), does not require that the Area Director have the statement of reasons before he exercises his discretion to finalize the cancellation decision.

. 25 C.F.R. § 151.2 defines an “individual Indian” for land sale purposes as including “[a]ny person who is a descendent of” an enrolled member of a tribe, if the descendent was residing on an Indian reservation on June 1, 1934. 25 C.F.R. § 151.2(c)(2). Stuart qualifies under this provision because his mother, Rose Stuart, is an enrolled member of the Fort Belknap Indian Community.