117 F.3d 1107
 97 Cal. Daily Op. Serv. 5188, 97 Daily Journal
D.A.R. 8403
YAVAPAI-PRESCOTT INDIAN TRIBE, Plaintiff-Appellee,
v.
Harold SCOTT, in his official capacity as Director of the
Arizona Department of Revenue; Tony West, in his official
capacity as Treasurer of the State of Arizona,
Defendants-Cross-Defendants-Appellants,
v.
PRESCOTT CONVENTION CENTER, INC., an Arizona corporation,
Defendant-Cross-Claimant-Appellee.
 No. 96-16416.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 7, 1997.
Decided June 30, 1997.
 
 David Jeremy Bodney, Steptoe & Johnson, Phoenix, AZ, for plaintiff-appellee.
 Patrick Irvine, Assistant Attorney General, Phoenix, AZ, for defendants-cross-defendants-appellants.
 Cameron C. Artigue, Gammage & Burnham, Phoenix, AZ, for defendant-cross-claimant-appellee.
 Appeal from the United States District Court for the District of Arizona; C.A. Muecke, District Judge, Presiding. D.C. No. CV-95-00124-CAM.
 Before: PREGERSON, JOHN T. NOONAN, and KLEINFELD, Circuit Judges.
 Opinion by Judge NOONAN; Dissent by Judge PREGERSON.
 NOONAN, Circuit Judge:
 
 
 1
 Yavapai-Prescott Indian Tribe (the Tribe) brought this action for declaratory relief and an injunction against Harold Scott in his official capacity as Director of the Arizona Department of Revenue and Tony West in his official capacity as Treasurer of the State of Arizona (collectively, "the State" or "Arizona"). Prescott Convention Center, Inc., an Arizona corporation, (PCC) was also named as a defendant by the Tribe and became a cross-claimant against the State. From judgment in favor of the Tribe, the State appeals.
 
 
 2
 The case involves the judge-created law on the preemption of state taxes imposed on sales by non-Indians to non-Indians on an Indian reservation. Whether there is preemption depends on proof that the federal and tribal interest in the activity outweighs the interest of the State. Holding that in this case the plaintiff Tribe has failed to establish the superior interest necessary for preemption, we reverse the judgment of the district court.
 
 THE PARTIES AND THE PROPERTY
 
 3
 The Plaintiffs. The Tribe, an Indian tribe recognized by the United States, has currently 143 members, of whom 65 live on the Yavapai-Prescott Reservation (the Reservation) next to the City of Prescott, Arizona.
 
 
 4
 The State Defendants. These defendants are responsible for the collection of taxes for the State.
 
 
 5
 The Private Defendant-Cross-Claimant. PCC is the lessee of a hotel on the Reservation (the Hotel).
 
 
 6
 The Hotel. In 1983 the Tribe received a grant of $1.12 million from the United States Department of Housing and Urban Development for the construction of the Hotel. The Tribe entered into an agreement with PCC to build the Hotel and to lease it from the Tribe. To finance this construction the Tribe loaned $1.1 million of the grant money to PCC. The bulk of the money needed for construction, $8.5 million, was borrowed by PCC from the Tribe through bonds issued by the Industrial Development Authority of the City of Prescott and guaranteed by the Household Finance Corporation.
 
 
 7
 As part of the construction deal PCC also became the lessee of the Hotel. The lease provided both the terms of the Tribe's loan and the rent to be paid. In consideration of the loan, PCC agreed to pay 2 percent annually, plus 20 percent of the annual net cash flow, defined as all income less operating expenses, franchise fees, debt service, and a replacement reserve; and in addition, on an assignment of the lease, the Tribe was entitled to 30 percent of the net proceeds of the assignment, defined as the gross proceeds less the outstanding balance on the mortgage and less "the equity" of PCC, defined as the cost of construction less sums borrowed. The rent was set as $35,000 per annum plus 1 percent of the gross revenue less taxes, telephone charges and franchise fees for the years of 1987 and 1988 and 1-1/4 percent thereafter. The Tribe was also entitled to levy a 1 percent transaction privilege tax on gross revenue and to increase this tax to an amount equivalent to the Arizona tax on similar businesses conducted outside the Reservation if the Arizona tax on the lessee's operations inside the Reservation was "declared unconstitutional, or deleted from the Arizona Revised Statutes, so that it no longer applies to Lessee's operations on the reservation."
 
 
 8
 Other pertinent terms were these: Title to all buildings and improvements vested immediately in the Tribe. PCC agreed to pay for all utilities and to maintain and repair all buildings. It was agreed that the Tribe should have no responsibility to provide or pay for police protection, fire protection, or street maintenance.
 
 
 9
 In 1985 the Secretary of the Interior approved the lease. The Hotel was built. It is a five-story structure with 161 rooms, half of them suites. (The suites, as more expensive, have presumably the better view, to the west over the city of Prescott.) The Hotel has a restaurant, an entertainment lounge, a salon, a health club, a pavilion in summer, and over 8,000 square feet of convention facilities including a ballroom and break-out rooms. The lounge has live entertainment five days a week. Food service is a substantial part of the Hotel's business. On peak days the Hotel serves as many as 1,200 meals, using the ballroom and pavilion as well as the restaurant.
 
 
 10
 At its start, the Hotel obtained a franchise to operate as a Sheraton Hotel. On August 21, 1992 the Tribe subleased 2150 square feet of floor space from the Hotel in order to set up a gaming facility known as Bucky's at a rent of 25 percent of the gross receipts from gaming devices (slot machines and automated poker games). Since August 1992 the Hotel has been operated as part of the Grace Hospitality Group and known as the Prescott Resort and Conference Center.
 
 PROCEEDINGS
 
 11
 The State issued an assessment for the business transaction privilege taxes collected by PCC on room rentals and food and beverage sales through December 31, 1990. On November 15, 1994 the Arizona Board of Tax Appeals affirmed the assessment. On January 12, 1995 the Board denied a motion for rehearing.
 
 
 12
 On January 23, 1995 the Tribe brought this action naming both the State and PCC as defendants. PCC filed a cross-complaint against the State. On April 25, 1996 the district court ruled on cross-motions for summary judgment. Carefully setting out the facts and relevant Supreme Court and Ninth Circuit precedent, the court held (1) that the legal incidence of the State taxes was not upon the Tribe and (2) that the federal and tribal interests in the activities taxed outweighed the State's, so that as a matter of federal law the State was preempted from exercising its taxing power upon the sales of the Hotel. On June 13, 1996 the district court entered judgment enjoining the State from collecting the taxes and PCC from paying the taxes to the State.
 
 
 13
 The State appeals.
 
 ANALYSIS
 
 14
 The Balance of Tribal, Federal and State Interests. The balancing required of a court determining whether taxation by the State is preempted has the ad hoc and particular character of a common law case developing common law based on the facts and like a common law decision must not do violence to precedent and must indeed fit within the frame established by precedent. In our case, three recent decisions of our court--Gila River Indian Community v. Waddell, 967 F.2d 1404 (9th Cir.1992) (per Fletcher, Nelson and Fernandez) (Gila River I); Salt River Pima-Maricopa Indian Community v. State of Arizona, 50 F.3d 734 (9th Cir.) (per Fletcher, Pregerson and Rymer), cert. denied, --- U.S. ----, 116 S.Ct. 186, 133 L.Ed.2d 123 (1995) (Salt River); and Gila River Indian Community v. Waddell, 91 F.3d 1232 (9th Cir.1996) (per Reinhardt, Thompson and O'Scannlain ) (Gila River II)--provide guidance within the context of the decisions of the United States Supreme Court which they reflect and interpret.
 
 
 15
 In Gila River I, the following alleged facts weighed in favor of preemption of Arizona business transaction privilege taxes laid on ticket sales to non-Indians for boat races and performances by two non-tribal lessees:
 
 
 16
 1. The income the Tribe received contributed to the economic well-being and self-sufficiency of the Tribe.
 
 
 17
 2. The United States held the fee to the property in trust for the Tribe.
 
 
 18
 3. The lake and marina on which the activities were conducted were constructed wholly with federal funds.
 
 
 19
 4. Any improvements belonged to the Tribe.
 
 
 20
 5. The several leases involved were all approved by the Secretary of the Interior as required by 25 U.S.C. § 415.
 
 
 21
 6. One lessee paid a sizable base rent plus a percentage of gross receipts in excess of $4 million to the Tribe.
 
 
 22
 7. The Tribe enforces regulations concerning sewage and sanitation.
 
 
 23
 8. A "significant number" of members of the Tribe were employed. Gila River I, 967 F.2d at 1406-1407.
 
 
 24
 9. The Tribe was actively involved in the production of the entertainment and worked "closely" with the lessees "to ensure that they provide high quality entertainment to the public." Id. at 1410.
 
 
 25
 In Salt River, the following facts weighed in favor of preemption of Arizona business transaction privilege taxes laid on sales to non-Indians by non-Indian lessees of a shopping mall:
 
 
 26
 1. The income received by the Tribe contributed to its economic well-being and self-sufficiency.
 
 
 27
 2. The United States held the fee in trust for individual tribal allottees on the reservation.
 
 
 28
 3. The improvements belonged to the tribal allottees.
 
 
 29
 4. The leases were subject to approval by the Secretary of the Interior.
 
 
 30
 5. The Tribe provided police protection.
 
 
 31
 6. The Tribe provided fire protection in conjunction with the city.
 
 
 32
 7. The Tribe conducted safety and health inspections.
 
 
 33
 8. The Tribe enforced the zoning laws.
 
 
 34
 9. The Tribe collected a 1 percent sales tax on gross sales amounting to over $1 million.
 
 
 35
 On the other hand, the following factors weighed in favor of the State in addition to the sales being made by non-Indians to non-Indians:
 
 
 36
 1. Almost all of the goods sold by the tenants were off-reservation goods.
 
 
 37
 2. The Tribe did not have any share as a lessor in the gross receipts.
 
 
 38
 3. The State provided the governmental services used by the non-Indians.
 
 
 39
 4. The State provided highway access. Salt River, 50 F.3d at 735.
 
 
 40
 In Gila River II the allegations made in Gila River I were tested by the evidence provided in the motion for summary judgment. Some of the same factors were found present, others were not. In particular, the federal funding of the facility, the approval of the leases by the Secretary of the Interior, the ownership of the fee, the Tribe's title to improvements were not disputed. Gila River II, 91 F.3d at 1234-35. The Tribe's role in "providing clean and safe facilities" was acknowledged. Id. at 1238. On the other hand, the allegation that a "significant number" of the Tribe worked for the lessees did not hold up. Id. No more than six members of the Tribe had worked for one of the lessees. Id. The allegation as to the Tribe's share in the gross was found to be overblown. The lessees had never grossed $4 million, so the Tribe had never shared in their receipts. Moreover, it was found that the State provided police protection and traffic control; that the State exercised concurrent jurisdiction with the Tribe as to liquor sales; that the State provided a forum for civil and criminal litigation arising on the reservation between non-Indians; and that the Tribe's control over events consisted only in the ability to shut down a scheduled event on the ground of public safety. Id. at 1238-39.
 
 
 41
 In Gila River I the court held that the allegations set out a claim for preemption that could not be dismissed on its face. Gila River I, 967 F.3d at 1413. In Salt River the court ruled that summary judgment was properly granted in favor of the State, observing that the Tribe "contributes relatively little to the value of the products and services sold at the mall; the businesses are managed and owned by non-Indians and the [Tribe] does not participate in business decisions and does not share in the profits." Salt River, 50 F.3d at 738. Even more significantly, the court stated: "When taxes are imposed on the sale of non-Indian products to non-Indians, as is the case here and in the so-called 'smoke shop' cases, the preemption balance tips toward state interests." Id. at 737.
 
 
 42
 Gila River II was decided in the light of Gila River I and Salt River. We held that summary judgment was properly granted to the State, declaring that the case was "controlled" by Salt River. Gila River II, 91 F.3d at 1236. Salt River had distinguished Gila River I as a case where the Tribe had "maintained an active role in the business enterprise by developing and marketing on-reservation entertainment to the general public." Salt River, 50 F.3d at 738. When the evidence in Gila River II failed to sustain this allegation of "an active role", the preemption case of the Gila River Tribe looked like the lost case of the Salt River Tribe. Moreover, the court added, the State's services justified its tax on those benefitting from them. Gila River II, 91 F.3d at 1238-39.
 
 
 43
 Besides the differences in the facts as alleged and as found on the second round, the legal standards employed were nuanced and refined. In Gila River I the approval of the leases by the Secretary of the Interior was given substantial weight as comparable to the comprehensive federal regulation of the harvesting of timber that had led to preemption in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145-6, 100 S.Ct. 2578, 2584-85, 65 L.Ed.2d 665 (1980) (see Gila River I, 967 F.2d at 1411). In Salt River and Gila River II the Secretary's regulation of the leases was accorded little weight. Again, in Gila River I the point was made that "where strong federal and tribal interests exist" the State's taxes had to be "narrowly tailored" to funding the services that the State provided in connection with the activities taking place on the reservation. Gila River I, 967 F.2d at 1412. In Salt River the relation between the state taxes and the services provided was not emphasized at all, presumably because the federal and tribal interest was not thought to be strong. It was also noted that there was no requirement that a state tax on reservation activities "must be proportionate to the services provided to the Indians." Salt River, 50 F.3d at 737. In Gila River II the latter statement was repeated as dispositive of the Tribe's objection that the taxes were not narrowly tailored. Gila River II 91 F.3d at 1239. It is evident that once a requirement of proportion between state services and state tax is not the criterion, the requirement of narrow tailoring is elusive and its appropriateness remains dependent on the strength of the tribal and federal interest found to exist.
 
 
 44
 In our case the following facts favor preemption:
 
 
 45
 1. The fee is held by the United States in trust for the Tribe.
 
 
 46
 2. The Tribe has furnished the site for the Hotel.
 
 
 47
 3. The Tribe has ownership of the Hotel, its facilities, and all improvements.
 
 
 48
 4. The Tribe has a residual interest in the assignment of the lease.
 
 
 49
 5. The Tribe, with the help of the federal government, furnished approximately 11 percent of the construction cost of the Hotel.
 
 
 50
 6. Since 1992 the Tribe has operated on the premises of the Hotel slot machines and automated poker games which attract some patrons to the Hotel.
 
 
 51
 7. The income from the lease contributes to the economic well-being and self-sufficiency of the Tribe.
 
 
 52
 8. The Secretary of the Interior has approved the leases involved.
 
 
 53
 Factors weighing against preemption are the following:
 
 
 54
 1. There is no evidence of employment by the Hotel of any members of the Tribe. The district court said that the record was not clear on this point. It was the Tribe's burden to provide evidence of tribal employment if there was any. PCC had agreed to prefer tribal members in hiring. The Hotel employs between 150 and 200 persons. The manager of the Hotel was not aware of any employee from the Tribe.
 
 
 55
 2. The bulk of the funding for the Hotel came from non-tribal and non-federal sources.
 
 
 56
 3. The tribal contribution to the quality of the food served at the Hotel is minimal--an inspection two or three times a year.
 
 
 57
 4. The Tribe receives only a guaranteed 1-1/4 percent of the Hotel's gross revenues. The record does not reveal what it has received in terms of the 20 percent of net revenues. As the Tribe's expert Joseph Kalt stated, this return is "subject to capital recapture provisions."
 
 
 58
 5. The Tribe does not have an active role in the business of the Hotel.
 
 
 59
 6. The State provides these services to the Hotel:
 
 
 60
 (a) The criminal law governing the operation of the Hotel, such as the statutes on fraud, on checks and credit cards, and on embezzlement. See, e.g., A.R.S. § 13-2310 (fraudulent schemes and artifices).
 
 
 61
 (b) The law governing liens, Red Mountain Machinery Co. v. Grace Investment Co., 29 F.3d 1408, (9th Cir.), cert. denied, 513 U.S. 1044, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994), and other security instruments such as the mortgages by which the Hotel is financed.
 
 
 62
 (c) The law governing employment at the Hotel, including the workman's compensation law specifically referenced by the lease.
 
 
 63
 In the light of these facts, we address preemption. The Hotel keeps separate accounts for food and beverage sales and the State tax on them and room sales and the State tax on them. We examine these sales separately. On balance, the Tribe contributes virtually nothing to the food and beverage sales of the Hotel. In this respect the case is no different from Salt River where two of the lessees were Taco Bell and Kentucky Fried Chicken and almost all of the goods sold were non-reservation goods. Salt River, 50 F.3d at 735. The distinction is suggested that a hotel restaurant has to take more care in the preparation of its food than a fast food outlet. The distinction exists, but it is irrelevant. The fact that more time is taken in the kitchen of the Hotel than at Taco Bell does not mean that the Tribe contributes more to the value of what is sold; the food preparation is done by PCC, not the Tribe. The beverages, of course, must be entirely brought in from outside. Approximately 1.5 percent of the food and beverage sales is from Bucky's; the amount is de minimis. There is, consequently, no basis on which it could be found that the substantial receipts generated by the Hotel's food and beverage service owe anything to the Tribe. There can be no preemption as to them.
 
 
 64
 A closer case is presented by the room receipts. Salt River and Gila River II both teach that the Tribe must have "an active role" in the creation of the value taxed in order to establish preemption. A distinction, however, may be urged where the business in question is that of a hotel. The value of the business of this Hotel is generated in part by its location; in part by its physical attraction; in part by its facilities including its lounge, exercise areas, and, it may be, gaming area; in part by the skill of its management in welcoming and cultivating its guests and maintaining its facilities; and in part by its franchised name. The Tribe argues that it provided the location, part of the funding for the structure and facilities, and the gaming. The difficulty with this argument is that the record does not permit a determination as to how much of the value arises from the Tribe's contribution.
 
 
 65
 The burden of proof was on the plaintiff Tribe. The Tribe moved for summary judgment on the record before the court, as did the State. When the parties have agreed that the facts are sufficient to decide the case, the party with the burden of proof must lose if it has failed to present enough facts to sustain its case. Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Such is the Tribe's position as to the room receipts of the Hotel. Accordingly, even if the Tribe's non-active role in relation to the Hotel were treated as important, insufficient evidence exists on this record to tip the balance in the Tribe's favor.
 
 
 66
 A straightforward application of our trilogy of cases confirms the conclusion reached by looking at the food and beverage sales and the room receipts separately. All the sales are by non-Indians to non-Indians. There is no tribal employment. There is no active tribal participation in the business. The State provides substantial governmental services to the business taxed. These four factors were decisive in Salt River and Gila River II. The ownership of the fee, the regulation of the leases by the Secretary of the Interior, minor tribal regulatory acts, and the impact of State taxation on tribal income were not enough to outweigh them. They fail to do so here.
 
 
 67
 The Legal Incidence Of The Taxes. The district court determined on the basis of the taxing statutes and an Arizona case addressing the question found that the legal incidence of the taxes fell on the seller of the services. A.R.S. § 42-1306; J.C. Penney Co. v. Arizona Dep't of Revenue, 125 Ariz. 469, 472, 610 P.2d 471, 474 (Ct.App.1980); Tower Plaza Investments, Ltd. v. DeWitt, 109 Ariz. 248, 250, 508 P.2d 324, 326 (1973). The seller of the Hotel's rooms, food, and beverages is PCC. The district court correctly concluded that PCC bore the legal incidence of the taxes.
 
 
 68
 On this appeal, as a way of sustaining the district court's judgment in its favor, the Tribe argues that it shares the legal incidence because of its arrangement with PCC whereby the Tribe gets part of the Hotel revenues and has a 30 percent interest in a net portion of the price if the Hotel is sold. The Tribe contends that with PCC it forms a "group or combination acting as a unit," which A.R.S. § 42-1301(8) defines as a "person" upon whom the taxes may fall. The Tribe bolsters its case by the affidavit of its expert Joseph Kalt that "the Tribe has an ownership position in the economic entity that functions as the seller."
 
 
 69
 The Tribe's argument is unavailing. Taxation, the Supreme Court has informed us, is "an intensely practical matter." Farmers' Loan & Trust Co. v. State of Minnesota, 280 U.S. 204, 212, 50 S.Ct. 98, 100, 74 L.Ed. 371 (1930). Yet it is not so practical a matter that legal lines can be disregarded. Stockholders form a group with their corporation and bear the economic incidence of a tax upon it. The legal incidence of the tax, nonetheless, falls upon the corporation. Any landlord with a percentage lease cutting him into a share of his tenant's business bears the economic incidence of a sales tax on the tenant's business; the tenant remains the party legally liable. If the landlord had a partial and remote economic interest in the sale of the tenant's business it would not alter the legal impact now of taxes levied on the tenant's sales. The Tribe is a landlord, not liable for the taxes. As the district court noted, Oklahoma Tax Commission v. Chickasaw Nation, 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) is dispositive in rejecting an economic approach to the incidence of taxation and insisting that legal incidence is the proper test. The courts have been firmly instructed to avoid the "daunting" inquiry into economic incidence. Id. at ----, 115 S.Ct. at 2221.
 
 
 70
 The Tribe does not improve its case by citing with emphasis the J.C. Penney court's statement that in the case of a lease the Arizona tax falls on the landlord. If the imposition of taxes on the lease were at issue, then the legal incidence of the tax would be on the Tribe as landlord. In this case, the tax is imposed on the sale of rooms, beverages and food, not leases. Therefore, the legal incidence of the taxes is on the seller, PCC, of the items taxed. See J.C. Penney, 125 Ariz. at 472, 610 P.2d 471 (per O'Connor, J.).
 
 
 71
 REVERSED and REMANDED with instructions to enter judgment for the State.
 
 PREGERSON, Circuit Judge, dissenting:
 
 72
 The district court concluded that the balance of tribal, federal, and state interests in this case tips in favor of the Tribe and granted the Tribe's summary judgment motion. In doing so, the district court considered the Tribe's strong interest in economic development-a particularly weighty concern for a small and destitute 143-member Tribe.
 
 
 73
 The district court also properly considered the long-standing federal interest of promoting tribal sovereignty. Further, the district court noted the special relationship that exists between the Tribe and the federal government. That relationship included federal regulation of Indian gaming under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721. Finally, the district court also noted that the Tribe received a $1.12 million Development Grant from the Department of Housing and Urban Development ("HUD"). This grant was used for economic development on the Reservation.
 
 
 74
 Because the district court correctly found that the balance of interests tips in favor of the Tribe, I submit that the majority is wrong in concluding that federal law does not preempt Arizona's privilege tax.
 
 I.
 
 75
 "The standard preemption analysis is inapplicable to cases involving Indian law." Gila River Indian Community v. Waddell ("Gila River II "), 91 F.3d 1232, 1236 (9th Cir.1996). In the Indian law context, state law is preempted if the balance of tribal, federal, and state interests tips in favor of preemption. Id. Traditional notions of Indian sovereignty and the federal goal of promoting tribal self-government provide a crucial "backdrop" for the preemption analysis. Id. This "backdrop" requirement requires that treaties and federal statutes be interpreted generously to comport with traditional notions of sovereignty and with the federal policy of encouraging tribal independence. Id. at 1236.
 
 II.
 
 76
 A tribe that plays an active role in generating activities of value on its reservation has a strong interest in maintaining those activities free from state interference. Cabazon Band of Mission Indians v. Wilson ("Cabazon v. Wilson"), 37 F.3d 430, 434-35 (9th Cir.1994) (citing Gila River Indian Community v. Waddell ("Gila River I"), 967 F.2d 1404, 1410 (9th Cir.1992)). In this case, the Tribe has provided substantial evidence that it plays an active role in generating activities of value on its Reservation.
 
 
 77
 The Tribe generates value by operating a casino within the Hotel. This case is substantially similar to California v. Cabazon Band of Mission Indians ("California v. Cabazon"), 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), and Cabazon v. Wilson, 37 F.3d 430 (9th Cir.1994)-two cases finding state regulation of on-reservation gaming activities preempted by federal law.
 
 
 78
 In California v. Cabazon, two tribes conducted on-reservation bingo games. 480 U.S. at 204-05, 107 S.Ct. at 1085-86. The Supreme Court found that an important tribal interest existed because the tribes "built modern facilities which provide recreational opportunities and ancillary services to their patrons...." Id. at 219, 107 S.Ct. at 1093. The two tribes were "generating value on the reservations through activities in which they have a substantial interest." Id. at 220, 107 S.Ct. at 1093.
 
 
 79
 Similarly, in Cabazon v. Wilson, we found that a state tax on simulcast wagering-off-track betting-at a facility located on the reservation was preempted by federal law. 37 F.3d at 435. We noted that the tribes "have invested significant funds and effort to construct and to operate wagering facilities and to attract patrons." Id. We stated: "It is sufficient that the [tribes] have made a substantial investment in the gaming operations and are not merely serving as a conduit for the products of others." Id.
 
 
 80
 As was true in California v. Cabazon, and Cabazon v. Wilson, the Tribe in this case has a substantial interest in the Hotel and the casino. The Tribe made a $1.1 million dollar investment in the Hotel.[1] In return, the Tribe is entitled to receive twenty percent of net operating revenues (excluding taxes paid to the State) and thirty percent of the proceeds of any transfer of the leasehold interest of Prescott Convention Center ("PCC"). The Tribe also owns the Hotel's physical structure and improvements and leases the property to PCC. PCC, in turn, leased portions of the Hotel to the Tribe for the purpose of operating the casino.
 
 
 81
 The Tribe's interest in the Hotel and casino are one and the same because the Hotel and the casino are closely interrelated. The Hotel advertises the casino to attract customers both for lodging and for meals. The Hotel's promotional materials identify the Hotel as the "Prescott Resort Conference Center and Casino." Furthermore, many of the Hotel's patrons spend extended periods of time on the Reservation and participate in the Tribe's casino.[2]
 
 
 82
 Given the Tribe's small size-the Tribe currently has 143 members, of whom approximately sixty-five live on the Reservation-the Tribe's interest in the Hotel's operations is even more compelling. Without the coordinated efforts of outside developers it would be difficult, if not impossible, for the Tribe to engage in any meaningful economic development.
 
 
 83
 As stated above, HUD awarded the Tribe a $1.12 million Development Grant. In doing so, HUD specifically found that constructing and operating the Hotel would encourage the Tribe's economic development. The Development Grant required that the Tribe and a non-Indian developer obtain additional financing. By joining with a non-Indian developer to construct the Hotel, the Tribe has promoted its economic development beyond what it could achieve through its own efforts.[3]
 
 
 84
 The Tribe has demonstrated a strong interest in the Hotel's operations through its concerted and sustained efforts to develop and manage its resources-the commercial value of its land.[4]
 
 III.
 
 85
 This case implicates two federal interests: (1) tribal economic development and (2) comprehensive federal regulatory schemes that include (a) leasing trust lands, (b) the Indian Gaming Regulatory Act ("IGRA"), and (c) the $1.12 million HUD Development Grant.
 
 A. Tribal Economic Development
 
 86
 "The promotion of tribal economic development has long been recognized as an important federal interest." Gila River II, 91 F.3d at 1237; see also California v. Cabazon, 480 U.S. at 217 n. 20, 107 S.Ct. at 1093 n. 20 ("It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government.") (quoting 19 Weekly Comp. Pres. Doc. 96, 99 (Jan. 24, 1983)); 30 Weekly Comp. Pres. Doc. 941, 943 (Apr. 29, 1994) (discussing the need for "special incentives to invest in reservations" and to "develop capital for new businesses on reservations"). The Supreme Court, however, has rejected the federal interest in tribal economic development as an overriding force preempting an otherwise valid state tax on non-Indian activity. Gila River II, 91 F.3d at 1237 (citing Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). Thus, a federal interest "in assisting tribes in their efforts to achieve economic self-sufficiency ... does not, without more, defeat a state tax on non-Indians." Salt River Pima-Maricopa Indian Community v. Arizona, 50 F.3d 734, 739 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 186, 133 L.Ed.2d 123 (1995) (emphasis added). In this case, however, something "more" exists-the Tribe's casino.
 
 B. Comprehensive Federal Regulatory Schemes
 
 87
 Three federal regulatory schemes also support the conclusion that a strong federal interest exists in this case.
 
 
 88
 The federal statutes authorizing the lease of trust lands and the regulations governing such leasing constitute one comprehensive federal scheme. See, e.g., 25 U.S.C. § 415; 25 C.F.R. § 162 (requiring the approval of the Secretary of the Interior for leases). In Gila River II, however, we found that the regulatory scheme governing leases was "insufficient to preempt a state tax imposed on non-Indians for transactions with other non-Indians." Id. at 1237. But this case, unlike Gila River II, implicates two additional federal regulatory schemes-IGRA and the $1.12 million HUD Development Grant.
 
 
 89
 Federal law regulating Indian gaming constitutes a comprehensive federal regulatory scheme. The Tribe exercises exclusive control over the casino. The federal government regulates the operation of Indian gaming under IGRA, 25 U.S.C. §§ 2701-2721. IGRA clearly addresses the federal interest in regulating Indian gaming: "Intended to 'promot[e] tribal economic development, self-sufficiency, and strong tribal governments,' IGRA seeks to 'ensure that the Indian tribe is the primary beneficiary of the gaming operation.' " Cabazon v. Wilson, 37 F.3d at 433 (alterations in original) (citing 25 U.S.C. § 2701(1), (2)).
 
 
 90
 Moreover, to foster economic development, the Tribe applied for and received a $1.12 million HUD Development Grant. A comprehensive federal scheme regulates HUD's Development Grants. See 24 C.F.R. § 570.450. Such grants are designed to stimulate economic development necessary for economic recovery.
 
 
 91
 The federal policy supporting tribal economic development, the Tribe's involvement in the casino, the federal regulatory scheme governing leases of trust lands, IGRA, and the $1.12 million HUD Development Grant, all compel the conclusion that strong federal interests exist.
 
 IV.
 
 92
 State interests are strongest "when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 157, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980).
 
 
 93
 In Gila River II, we found that the state involvement on the reservation constituted a sufficient state interest to justify a state tax on entertainment events. 91 F.3d at 1239. In that case, the Tribe developed a motor and aquatic raceway for sporting events, and an amphitheater for the performing arts on its reservation. Id. at 1235. The court noted that the state provided "a number of governmental functions critical to the success" of the entertainment events. Id. at 1238.
 
 
 94
 In Salt River, we upheld a state tax on non-Indian businesses selling products and services to other non-Indians at a shopping mall located on the tribe's reservation. Salt River concluded that "Arizona and its agents provide the majority of the governmental services...." Id. at 737 (emphasis added).
 
 
 95
 Unlike Gila River II and Salt River, in this case the state does not provide the overwhelming "majority" of services and does not provide services "critical" to the Hotel's success. In fact, the State is reimbursed for most of the services that it provides to the Reservation. When a tribe reimburses the State for the services provided by the State, the State's interest is weak. Cabazon v. Wilson, 37 F.3d at 435.
 
 
 96
 The Tribe pays the Yavapai County Sheriff for law enforcement services. The Tribe also pays the Central Yavapai Fire District for fire protection and emergency medical services to the Reservation. Although the Arizona Department of Transportation installed and maintains two traffic lights near the Hotel, the Bureau of Indian Affairs reimbursed the State for one-half the construction cost of the traffic lights and the Tribe pays for the electricity. The only services that Arizona provides at its own expense are educational services for the Tribe's children, health services to Tribe members, and liquor licensing to the Hotel.[5]
 
 V.
 
 97
 There is no requirement that a "tax imposed on non-Indians for reservation activities be proportional to the services provided by the State...." Gila River II, 91 F.3d at 1239 (emphasis added) (citing Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 185 n. 15, 109 S.Ct. 1698, 1713 n. 15, 104 L.Ed.2d 209 (1989)). Nevertheless, "this court has required that the State demonstrate a close relationship between the tax imposed on the on-reservation activity and the state interest asserted to justify such tax." Cabazon v. Wilson, 37 F.3d at 435 (emphasis added).
 
 
 98
 Defendants Scott and West admit that no portion of the privilege tax is segregated for tribal purposes. Because the privilege tax does not fund services related to the Hotel's operations or the Reservation, there can be no "close relationship" between the privilege tax and the services provided by the State. See Cabazon v. Wilson, 37 F.3d at 435 (concluding that tax was not narrowly tailored because one hundred percent of it went to the state's general fund).
 
 
 99
 In sum, the Tribe has provided compelling evidence that it has a strong interest in the Hotel's operations because it is involved in "generating activities of value" by operating a casino within the Hotel. Strong federal interests exist through the federal regulation of Indian gaming, the lease of trust lands, the $1.12 million HUD Development Grant, and the federal policy of promoting tribal economic development. These strong tribal and federal interests outweigh the State's weak interest because the State is reimbursed for most of the services that it provides to the Tribe.
 
 
 100
 For the reasons set forth above, I would affirm the district court's decision
 
 
 
 [1]
 The $1.12 million HUD Development Grant required the Tribe to loan $1.1 million to the Hotel's developer. The remaining $20,000 was used to pay the Hotel's administration costs
 
 
 [2]
 The majority faults the Tribe for failing to provide a specific "determination as to how much of the value arises from the Tribe's contribution." Majority Op. at 7551. This standard creates a nearly insurmountable burden on the Tribe. The Tribe has demonstrated that the casino and the Hotel are interrelated. This is sufficient to demonstrate that the Tribe's activities "generate value" regardless of the determination of an exact dollar amount
 
 
 [3]
 The majority notes that the record does not reflect that the Hotel employs any members of the Tribe. That fact, however, does not render the Tribe's interest in the Hotel insignificant. The Tribe is not limited to economic development solely through increased employment opportunities
 
 
 [4]
 The Tribe's most significant interests in this case relate to generating value in the Hotel's operations and economic development. Nonetheless, the majority acknowledges several other tribal interests including: (1) the Hotel's location on the reservation; (2) the Tribe's ownership of the Hotel, its facilities, and all improvements; (3) the Tribe's residual interest in the assignment of the lease; and (4) the Tribe's contribution of approximately 11% of the Hotel's construction cost. In combination, these factors also compel the finding that the Tribe has a strong interest in the Hotel's operations
 
 
 [5]
 The majority indicates that the State provides the Hotel with the following services: criminal law governing the Hotel's operation; the law governing liens; and the law governing worker's compensation. Majority Op. at 7549-50. Each of these state interests, however, are merely incidental and not "critical to the success" of the Hotel