963 P.2d 303

**Gary LOVENESS and Elizabeth Loveness, husband and wife, Plaintiffs–Appellants,**

v.

**STATE of Arizona, ex rel., ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellee.**

No. 1 CA–TX 97–0003.

Court of Appeals of Arizona, Division 1, Department T.

Jan. 22, 1998.

Review Denied Sept. 24, 1998.

Bryan Cave LLP by Neil Vincent Wake, Robert C. Van Voorhees, Phoenix, for Plaintiffs–Appellants.

Grant Woods, Attorney General by Patrick Irvine, Assistant Attorney General, Phoenix, for Defendant–Appellee.

## OPINION

WEISBERG, Judge.

¶ 1   Gary and Elizabeth Loveness ("taxpayers") appeal from a summary judgment granted in favor of the Arizona Department of Revenue ("DOR") on taxpayers' claim for a partial refund of their Arizona income taxes.  The taxes at issue arose out of services performed by taxpayers on an Indian reservation in Arizona.  They argue that DOR's assessment of a tax on their personal net income, which arose out of on-reservation logging services, was invalid under the Supremacy Clause of the United States Constitution because it:

1.  was preempted by the comprehensive federal regulation of on-reservation

logging, *see White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); or

2. infringed on the right of reservation Indians to make their own laws and be ruled by them, *see Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

We disagree with taxpayers and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The taxpayers are non-Indians who lived in Arizona outside the boundaries of the Fort Apache Indian Reservation ("Reservation") during the relevant period. They were the sole shareholders of Basin Building Materials, Inc., which did business as Pinetop Logging Company ("Pinetop") during 1987 and 1988.

¶ 3 The Reservation is the preserve of the White Mountain Apache Tribe ("the tribe") and consists of approximately 1.64 million acres in the White Mountains. This area includes about 720,000 acres of commercial forest, of which about 300,000 acres are managed with selective cutting on a sustained yield basis.

¶ 4 The tribe manages, harvests, mills and sells timber as the Fort Apache Timber Company ("FATCO"). The tribe's timber operation is its most important economic activity. Subject to U.S. Bureau of Indian Affairs ("BIA") supervision, FATCO is responsible for the tribe's timber operation.

¶ 5 BIA representatives designate the trees that are to be cut on the Reservation. The tribe's contractors cut the trees and transport the logs to FATCO's sawmill. FATCO employees then sort the logs and process them into lumber and pulpwood. Although the tribal government owns and manages the timbering operation on the Reservation, it cannot disburse any profits without first satisfying outstanding obligations to the United States government and obtaining BIA's approval.

¶ 6 BIA's supervision and control over timbering practices on Indian reservations extended to all activities of FATCO and its contractors during the relevant period. *See*

*generally* 25 U.S.C. §§ 405–07; 25 C.F.R. § 163; 36 C.F.R. § 200; *Bracker*, 448 U.S. at 138–39, 145–49, 100 S.Ct. at 2581, 2584–87. The BIA head forester in charge of the Reservation described BIA's supervision as "encompassing all aspects of forest utilization and management, including extensive rules and regulations governing in detail the planning, engineering, construction, maintenance and general regulation of all roads used by loggers."

¶ 7 FATCO delegates certain portions of the tribe's timber operation to companies like Pinetop. From 1969 through 1988, Pinetop conducted logging operations on the Reservation under contract with the tribe. Pinetop maintained its business office, assets, and business operations on the Reservation. Pinetop owned the trucks and equipment it used in the FATCO logging operation. Over half its employees were members of the tribe. Before Pinetop contracted with the tribe to do this work, it was advised by a representative of DOR's predecessor agency that the agency had no jurisdiction over its proposed transactions, either as to sales tax on timbering or use tax on equipment brought onto the Reservation.

¶ 8 In 1971, the Arizona Highway Department and Arizona Highway Commission assessed delinquent motor carrier license and fuel taxes against Pinetop. Pinetop disputed their authority to do so. Ultimately, the United States Supreme Court resolved the controversy, finding that the state taxes were preempted. The Court said:

> Where, as here, the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber, where a number of the policies underlying the federal regulatory scheme are threatened by the taxes respondents seek to impose, and where respondents are unable to justify the taxes except in terms of a generalized interest in raising revenue, we believe that the proposed exercise of state authority is impermissible.

*Bracker*, 448 U.S. at 151, 100 S.Ct. at 2588.

¶ 9 In December 1986, taxpayers converted Pinetop into a Subchapter S corporation for federal and state tax purposes. The ef-

fect of a "Sub S" election is to end taxation of corporate net income and tax it as the personal net income of shareholders. , *See* I.R.C. § 1361 (1994). Pinetop's activities on the reservation continued through 1988, when taxpayers retired.

¶ 10 For tax years 1987 and 1988, taxpayers received salaries from Pinetop on which they reported and paid federal and Arizona income taxes. They also reported and paid federal income taxes on Pinetop's net income, which included ordinary income, interest income, and recapture of accelerated depreciation.[1] *See* I.R.C. § 1231. However, in their Arizona resident income tax returns for both years they subtracted Pinetop's net income, which had flowed through to them, in arriving at Arizona taxable income, stating that those sums were immune from Arizona income taxation "by virtue of preemptive federal regulations of harvest of Indian timber," citing *Bracker*.

¶ 11 DOR audited taxpayers' individual Arizona income tax returns for 1987 and 1988. In 1990, DOR determined that taxpayers had incorrectly subtracted Pinetop's net income in calculating their Arizona taxable income and proposed to assess corresponding income tax deficiencies against them.[2] After exhausting their administrative remedies, taxpayers commenced this action in the tax court under A.R.S. sections 42–124(C) and (D).

¶ 12 On cross-motions for summary judgment the tax court distinguished the instant case from *Bracker*. It found that the motor vehicle registration and use fuel excise taxes were different from the general income tax applied here because the former had taxed on-reservation activity and reduced both tribal revenues from timber sales and tribal contractors' potential profits.

¶ 13 The tax court found that, in this case, the individual income tax did not tax on-reservation activity, did not burden the tribe or its members, and did not reduce either tribal revenues from timber sales or potential profits of tribal contractors. It also found that taxpayers had not explained how imposing the Arizona individual income taxes on non-Indian, non-residents who earned the income on an Indian reservation infringed upon the right of tribal self-government. It therefore granted summary judgment for DOR.

¶ 14 Taxpayers bring this timely appeal, which is assigned to Department T of this court pursuant to A.R.S. sections 12–120.04(G) and 12–170(C).

## DISCUSSION

### APPLICABILITY AND EFFECT OF BRACKER

¶ 15 Both sides agree that the relevant facts are identical to those in *Bracker* except for one: the tax challenged here is Arizona's resident individual income tax, not its motor carrier registration or use fuel tax. We must decide whether this difference changes the *Bracker* analysis and compels a different result. We conclude that it does.

¶ 16 The motor carrier registration tax and use fuel tax that were challenged in *Bracker* were activity taxes (i.e. taxes that are assessed for conducting an activity). *Id.* at 139–40, 100 S.Ct. at 2581. The motor carrier license tax was imposed on all common motor carriers of property and the use fuel tax was assessed for using a motor vehicle on Arizona highways. *See id.* Both taxes are assessed regardless of the income/profit related to the activity and are a cost of doing business. *See id.*

¶ 17 By contrast, Arizona's resident income tax is an undifferentiated tax not identified with, or a function of, any particular source of gross income. *See* A.R.S. §§ 43–1001(1) & (2). This type of tax is an

---

1. In 1987 and 1988, as now, Arizona Revised Statutes Annotated ("A.R.S.") section 43–1001(2) (1980 and Supp.1997) defined "Arizona gross income" of a resident individual as his/her federal adjusted gross income for the taxable year. All sums reported as gross income of the taxpayer for federal income tax purposes would therefore be reflected, as adjusted by other additions and subtractions provided by federal law, in his/ her Arizona gross income for the same taxable year.

2. The income tax deficiencies DOR sought against taxpayers were based on the addition of $567,039 to the taxpayers' 1987 taxable income and $1,196,838 to that for 1988.

equitable way of distributing the burdens of government and is directly related to the ability of the taxpayer to pay it. *See New York ex rel. Cohn v. Graves,* 300 U.S. 308, 313, 57 S.Ct. 466, 467, 81 L.Ed. 666 (1937). Related and unrelated exemptions and deductions covering the entire taxable year affect the determination of taxable income for that year, and the resident's income tax liability does not vary with the source of the gross income. *See* A.R.S. §§ 43–1001(1) & (2).

¶ 18   Taxpayers argue that the activity taxes at issue in *Bracker,* in *Central Machinery Co. v. Arizona State Tax Commission,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980), and in a number of lower court decisions are conceptually the same as the income tax at issue here. They contend that, because these cases all involved a tax on the taxpayers' "gross income," the fact that taxpayers resided off-reservation is immaterial to the preemption analysis.

¶ 19   We disagree. The taxes in *Bracker,* and in all of the lower court cases upon which taxpayers rely, were taxes assessed on activities that occurred in Indian country. The character of these taxes was central to the *Bracker* Court's analysis. *See* 448 U.S. at 148, 150–51, 100 S.Ct. at 2586, 2587. They affected the cost of logging, impacted the federal regulatory scheme, and eventually took money away from the tribe in circumvention of Congress' intent.[3] *Id.* at 148, 151, 100 S.Ct. at 2586, 2587. *See also Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458, 115 S.Ct. 2214, 2220, 132 L.Ed.2d 400 (1995) ("The initial and frequently dispositive question in Indian tax cases . . . is who bears the legal incidence of the tax.") These activity taxes had direct negative financial effects on the Tribe which were critical to the Court's conclusion that they consti-

tuted an assertion of state authority on the reservation and were therefore preempted by federal law. *See* 448 U.S. at 151, 100 S.Ct. at 2587; *see also Yavapai–Prescott Indian Tribe v. Scott,* 117 F.3d 1107, 1112 (9th Cir. 1997) (Arizona business transaction privilege taxes are enforceable on hotel restaurant and room rental receipts for on-reservation facility because tribe does not have an "active role" in contributing to the business).

¶ 20   Moreover, since *Bracker,* the Supreme Court has modified the way it analyzes possible negative financial effects on individual Indians or their tribe when a tax is challenged by non-Indians conducting on-reservation activities. *See Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 186–87, 109 S.Ct. 1698, 1713, 104 L.Ed.2d 209 (1989); *Blaze Constr. Co. v. Taxation and Revenue Dep't,* 118 N.M. 647, 884 P.2d 803, 807 (1994). In *Cotton,* the Court faced the question of whether a state could impose a severance tax on the on-reservation production of oil and gas by non-Indian lessees who were also subject to severance taxation by the tribe. The Court held that it could.

¶ 21   The Court distinguished *Bracker*[4] by holding that typical indirect effects on federal or tribal interests cannot by themselves require preemption of a state tax. *See Cotton,* 490 U.S. at 186–87, 109 S.Ct. at 1713. The Court stated:

It is, of course, reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate. Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, is simply too indi-

---

**3.** The four factors cited in concluding that the application of the taxes in *Bracker* were preempted all related to the negative effect the taxes would have on the tribe. They were:

(1) the additional cost burdens the tax would interpose in the pervasive federal regulatory scheme for the management of tribal timber;

(2) the thwarting of the federal policy that all tribal timber sales profits benefit the tribe;

(3) the complicating and undermining of the Interior Secretary's ability to set fees and rates

for harvesting and selling tribal timber as federal law required him to do; and

(4) the hindering of the tribe's ability to comply with federal sustained-yield management policies.

448 U.S. at 148–49, 100 S.Ct. at 2586–87.

**4.** *See also Ramah Navajo School Bd., Inc. v. Bureau of Revenue,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

rect and too insubstantial to support Cotton's claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, absent some special factor such as those present in *Bracker* ..., would be to return to the pre–1937 doctrine of intergovernmental tax immunity.

*Id.* Thus, for a state tax to be preempted by federal or tribal law it must have more than an indirect effect on the federal regulatory scheme. *See id.*

¶ 22  No support beyond speculation exists for the view that any part of the income taxes assessed here imposed a direct economic effect on the tribe, undermined the tribe's interests, or limited federal policies advancing the comprehensive regulatory scheme pertaining to tribal timber harvesting and management. *Cf. State v. Blaze Constr. Co.*, 190 Ariz. 262, 266, 947 P.2d 836, 840 (App.1997) (holding Arizona contracting transaction privilege tax preempted by comprehensive federal regulatory scheme identified in *Bracker* as applied to taxpayer who contracted with BIA to construct on-reservation roads used by tribal members). Thus, the difference in the tax assessed is significant enough to distinguish this case from *Bracker.*

### ARIZONA'S AUTHORITY TO TAX RESIDENT INCOME

¶ 23  In the instant case, the State assessed a general income tax on the income of non-tribal members residing off the reservation. The Supreme Court recently held that a tax on the income of tribal members working for a tribe, but residing within the State outside Indian country, is not federally preempted. *See Chickasaw Nation*, 515 U.S. at 453, 115 S.Ct. at 2217.

¶ 24  In *Chickasaw Nation*, the Chickasaw tribe had argued that the imposition of Oklahoma's income tax on tribal members employed by that tribe was a law "for the government of the [Chickasaw] Nation ... and their descendants" that was preempted by the federal treaty with the Chickasaw Nation. *Id.* at 455, 115 S.Ct. at 2218. The Supreme Court disagreed. It relied on the well established principle that a jurisdiction

"may tax **all the income** of its residents, even that earned outside the taxing jurisdiction," and that this principle was not preempted by the rights granted or reserved by federal law. *Id.* at 462–63, 115 S.Ct. at 2222 (emphasis added). It further held that:

[T]he receipt of income by a resident of the territory of a taxing sovereignty is a taxable event.... Domicil itself affords a basis for such taxation. Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the costs of government.... These are rights and privileges which attach to domicil within the state.... **Neither the privilege nor the burden is affected by the character of the source from which the income is derived.**

*Id.* at 463, 115 S.Ct. at 2222 (citations omitted)(emphasis added). *See also Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 124, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (tribal members' liability for state income taxes depended on whether they resided inside or outside Indian country); *Graves*, 300 U.S. at 312–313, 57 S.Ct. at 467 (state may tax income from rents received by a state resident from property located outside of that state).

¶ 25  In this case, Arizona assessed a tax on taxpayers' net income for the taxable years of 1987 and 1988. It was not assessed on a member of the tribe who resided on the reservation. *Compare Chickasaw Nation*, 515 U.S. at 464, 115 S.Ct. at 2223 (principle that "Indians and Indian tribes are generally immune from state taxation" does not operate outside of Indian country or for non-tribal members.) It was assessed on the income of Arizona residents who were not members of the tribe and were within the State's taxing authority and is therefore a proper assessment. *See id.* at 463, 466, 115 S.Ct. at 2222, 2224; A.R.S. §§ 43–1001(1), (2), and § 43–1011.

¶ 26  Further, Congress has had the authority to change the taxability of this income if desired. *See generally Cotton*, 490 U.S. at 175, 109 S.Ct. at 1707; *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct.

1267, 1270, 36 L.Ed.2d 114 (1973) (Congress can grant immunity to an Indian Tribe for all income derived from activities on the reservation). It has not done so. As a result, there is no exception from the general principle permitting taxation of those who reside within a State's jurisdiction. *See Chickasaw Nation,* 515 U.S. at 463, 115 S.Ct. at 2222.

### INFRINGEMENT ON RIGHT OF TRIBAL SELF-GOVERNMENT

■ ¶ 27 The opinion in *Bracker* did not explore whether those taxes were invalidly imposed on the independent ground that they infringed the right of Indian nations to make their own laws and be ruled by them. *See* 448 U.S. at 143–44, 100 S.Ct. at 2583–84. In this case, however, taxpayers make that argument.

¶ 28 Taxpayers correctly observe that assertions of state jurisdiction on Indian reservations may improperly infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959); *cf. Bracker,* 448 U.S. at 143–44, 100 S.Ct. at 2583–84. They argue that the reason that the tribe was contracting out logging operations was to avoid the significant capital cost of doing its own logging and that these taxes could force the tribe to undertake that cost. Doing so, they argue, would drastically interfere with the tribe's judgments about the management of tribal economic affairs and business enterprises and its choices of how to invest tribal funds. *See Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 664 (9th Cir.1975).

¶ 29 Taxpayers cite *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 179, 93 S.Ct. 1257, 1266, 36 L.Ed.2d 129 (1973), for the proposition that the infringement rule is intended to test the permissible scope of state power over non-Indian aspects of transactions on reservations involving Indians and non-Indians. They rely on *McClanahan* for the proposition that the assessment of a state tax on a non-Indian related to on-reservation activity may be held infirm under the infringement doctrine when the financial burden of the tax falls on Indians. *Id.* at 170 n. 6, 93 S.Ct. at 1261 n. 6.

■ ¶ 30 We acknowledge that *McClanahan's* somewhat puzzling interpretation of *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965),[5] was based in part on the infringement doctrine.[6] But, the infringement doctrine as now conceived by the United States Supreme Court does not apply in cases testing the legality of state taxation of non-Indians arising out of on-reservation transactions, regardless of whether the economic burden of the tax is passed along to reservation Indians. *See Duro v. Reina,* 495 U.S. 676, 686–87, 110 S.Ct. 2053, 2060, 109 L.Ed.2d 693 (1990) ("We have held that States may not impose certain taxes on transactions of tribal members on the reservation because this would interfere with internal governance and self-determination ... [b]ut **this rationale does not apply to taxation of nonmembers,** even where they are Indians.")(emphasis added) (citations omitted).[7]

---

**5.** Limited by *Department of Taxation and Finance v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994).

**6.** Compare *McClanahan,* 411 U.S. at 170, 93 S.Ct. at 1261 (last full sentence) with *Warren Trading Post,* 380 U.S. at 686, 85 S.Ct. at 1243 (last sentence beginning on page). *Warren Trading Post* concerned Arizona retail transaction privilege taxation of a non-Indian's on-reservation sales of goods to reservation Indians.

**7.** *See also Washington v. Confederated Tribes,* 447 U.S. 134, 161, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980) ("Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe."); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 483, 96 S.Ct. 1634, 1646, 48 L.Ed.2d 96 (1976). *Accord Sac & Fox Nation,* 508 U.S. at 123, 113 S.Ct. at 1990 (*McClanahan* immunity from state taxation extends to Indian tribal members who reside on reservation or tribal trust lands); *Pimalco, Inc. v. Maricopa County,* 188 Ariz. 550, 558, 937 P.2d 1198, 1206 (App.1997) (rejecting non-Indians' infringement doctrine challenge to ad valorem taxes on their possessory interests in Indian land). *Cf. State v. Zaman,* 190 Ariz. 208, 211, 946 P.2d 459, 462 (1997) (in infringement cases question is whether state action has infringed self-governance rights of individual Indians).

¶ 31  We therefore conclude that taxpayers' infringement challenge is incorrect on its merits, as it principally repeats their arguments on the preemption issue, which we have already rejected.

ATTORNEYS FEES

¶ 32  Because taxpayers are not the prevailing party, we deny their request for an award of attorney's fees.

CONCLUSION

¶ 33  For the foregoing reasons, the judgment of the tax court is affirmed.

GRANT, P.J., and McGREGOR, J., concur.